SCHWABACHER ET AL. *v.* UNITED STATES ET AL.

No. 258. Argued January 6-7, 1948.—Decided May 3, 1948.

*Carl McFarland* argued the cause for appellants.   With him on the brief were *T. W. Dahlquist, Ashley Sellers* and *Stephen J. Angland.*

*Daniel H. Kunkel* argued the cause for the Interstate Commerce Commission, appellee.   With him on the brief was *Daniel W. Knowlton.*

*George D. Gibson* argued the cause for the Chesapeake & Ohio Railway Co. et al., appellees. With him on the brief were *R. W. Purcell, John C. Shields, George H. Gardner* and *John W. Riely.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

This controversy grows out of the voluntary merger of Chesapeake & Ohio Railway Company and Pere Marquette Railway Company, which companies, together with Alleghany Corporation, sought approval by the Interstate Commerce Commission. Pere Marquette is incorporated under the laws of Michigan, while Chesapeake & Ohio is chartered by Virginia. Chesapeake & Ohio acquired and for some years exercised active control of Pere Marquette, whose properties and operations complement rather than compete with those of Chesapeake & Ohio. Late in 1945 merger proceedings were commenced under enabling statutes of the two states and were consummated with approval of considerably more than the number of shares made necessary by statutes of the respective states. The Interstate Commerce Commission found, and there is no attack upon the findings, that the public interest is served by merger and unification of these properties and operations. The Commission also concluded that the plan as a whole, and as applied to each group of shareholders, is just and reasonable, and there is no attack upon this conclusion except that by the appellants which is treated fully herein. Consequently, details of the plan are of little importance to this litigation.

Appellants are owners of 2,100 shares of $100 par 5% cumulative preferred stock of Pere Marquette. Their interests aggregate a little less than 2% of the outstanding stock of this class. Dividends on this stock have been unpaid since 1931 and, as of the commencement of this

controversy, were in arrears in the sum of $72.50 per share, an amount that is increasing with time. The Pere Marquette charter provides for full payment of the stock at par, plus accrued unpaid dividends, "in the event of dissolution, liquidation, or winding up of the company, voluntary or involuntary . . . before any amounts are paid to holders of the . . . common stock." The appellants contend that the merger hereinafter described terminates the corporate existence and, under this clause as construed by Michigan law, amounts to a "winding up." They insist that since the merger makes provision for some compensation to common stockholders these appellants have the right, under Michigan law, to have their shares recognized on the basis of at least $172.50 each. The Commission found the market value per share ranged, at different times, from $87 to $99, while the merger terms give stocks in exchange which would have realized about $90 and $111 per share on the same dates. Appellants dissented from the merger, but Michigan law provides no specific right or procedure for appraisal and retirement of the holdings of a stockholder dissenting from a railroad merger.

When application was filed with the Interstate Commerce Commission under § 5 of the Interstate Commerce Act as amended (49 U. S. C. § 5), for approval and authorization of the merger,[1] as well as for other relief,

---

[1] Section 5 as amended provides in part as follows:

"(2) (a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership . . .

"(b) Whenever a transaction is proposed under subparagraph (a), the carrier or carriers or persons seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part

appellants intervened and asked that body to determine, recognize and protect their asserted right to the full legal liquidation figure. The Commission approved the merger and the merger terms, finding them just and

of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants . . . and shall afford reasonable opportunity for interested parties to be heard. . . . If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . .

"(c) In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) The effect . . . upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory . . .; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected. . . .

"(e) No transaction which contemplates a guaranty or assumption of payment of dividends or of fixed charges, shall be approved by the Commission under this paragraph (2) except upon a specific finding by the Commission that such guaranty or assumption is not inconsistent with the public interest. . . .

"(4) It shall be unlawful for any person, except as provided in paragraph (2), to enter into any transaction within the scope of subparagraph (a) thereof . . .

"(11) The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power (with the assent, in the case of a purchase and sale, a lease, a corporate consolidation, or a corporate merger, of a majority, unless a different vote is required under applicable State law, in which case the number so required shall assent, of the votes of the holders of the shares entitled to vote of the capital stock of such corporation at a regular meeting of such stockholders, the notice of such meeting to include such purpose, or at a special meeting thereof called for such purpose) to carry

reasonable as to each class of stockholders. However, it disclaimed jurisdiction to pass upon the further claims of the appellants asserted on the basis of their interpretation of Michigan law. It reviewed at some length the economic position of the stock. It recited that these shares had received no dividends since 1931 and that appellants' witnesses agreed that these stockholders could not expect to receive any dividends for many years, apart from the merger. The Commission also pointed out the deficit in operations of Pere Marquette for the first quarter of 1946 as contrasted with the net income of Chesapeake and Ohio, and concluded that "On the whole, it would seem that the prospects of Pere Marquette stockholders for returns on their investments would be enhanced by merger of their company into the Chesapeake & Ohio." The Commission did not question that the stockholders, on liquidation, dissolution or winding up of Pere Marquette, would be entitled to be paid in full the par value of their shares and accumulated dividends before any payment to holders of common stock. It did not undertake to deter-

---

such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. Nothing in this section shall be construed to create or provide for the creation, directly or indirectly, of a Federal corporation, but any power granted by this section to any carrier or other corporation shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State."

mine the ultimate worth of these stocks in case of an actual liquidation, but it considered their present intrinsic value on a capitalized earnings basis, an actual yield basis, and its present market position and concluded: "Accordingly, considering Pere Marquette's investment according to its books, other property values, the company's history as to earnings, its future prospects, and the market appraisal of its stocks, all as set forth above, we find that, as to the stockholders of both parties generally, the proposed ratios of exchange, stock issues, and assumptions of indebtedness are just and reasonable."

The Commission then noted the contention of the appellants that as to them the terms were not just and reasonable, because they are deprived of contract rights under Michigan law, which they have not waived. It is contended that the Commission should not remit the dissenting stockholders to remedies in state courts as the Commission would thereby decline the jurisdiction conferred by § 5 and § 20a of the Act.[2] But the Commission considered that it was entrusted with authority to decide the public interest aspects of the merger of these transportation facilities and that it could not be expected to enter into the question of "compensation of dissenting stockholders on specified bases" before approval and merger. It thought that, having found the treatment of each class to be just and reasonable, it had done its full duty "when we make certain that all stockholders of the same class are to be treated alike." It declined to decide the Michigan law question as to what the rights of dissenting stockholders were, and whether the merger was equivalent to a liquidation, but said: "This does not mean that the Chesapeake & Ohio and the Pere Marquette do not remain free to settle controversies with dissenting stockholders through negotiation and litigation in the courts."

---

[2] For pertinent provisions of § 5 and § 20a see notes 1 and 15 respectively.

Taking into account the small percentage of the dissenting shares, the current assets position of the Chesapeake & Ohio, and the maximum possible cost to the merged company of the settlement of these claims on the basis most favorable to appellants, it considered that the company was amply able to bear "any probable expenditure of cash that it might be required to make in connection with the merger. Accordingly, it appears that consummation of the merger will not involve a burden of excessive expenditure." The Commission thus left in a state of suspense, subject to further litigation or negotiation, these claims concerning the extent of the capital obligations of a constituent company, after examining them sufficiently to determine only that, however settled, they did not involve enough to affect the solvency of the new company or jeopardize its operations.

The Commission denied appellants' petition for rehearing and they filed suit in the United States District Court for the Eastern District of Virginia to set aside the order authorizing the merger. A court of three judges, convened as required by law,[3] sustained the Commission, 72 F. Supp. 560. Appellants bring to us[4] the question whether the Commission, in view of its authority over mergers, which is declared to be exclusive and plenary, could decline to determine just what the dissenting stockholders' legal rights were under the Michigan law and the Pere Marquette charter, and to recognize them in full by the terms of the merger.

The disposition of appellants' claims, as well as the nature of the claims themselves, requires consideration of the relative function and authority of federal and state law in regulating and approving voluntary railroad mergers. The appellants contend that their share in the merged company is to be measured by, or their remedies

---

[3] 28 U. S. C. § 47.

[4] 28 U. S. C. § 47 (a); 28 U. S. C. § 345.

as dissenters are to be found in, state law, but that the federal agency is bound to determine and apply that law. The Commission on the other hand refuses either finally to foreclose or to allow these claims. It apparently leaves it open to the state courts, or to the parties by negotiation, to add to the surviving carrier's capital obligations, which the Commission has found to be just and reasonable, others founded only in state law and as to which it has made no such findings. We conclude that neither position is wholly consistent with the federal statutory plan for authorization and approval of mergers.

It is not for us to adjudicate the existence or the measure of any rights that Michigan law may confer upon dissenting stockholders. Neither the Commission nor this Court can make a plenary and exclusive decision as to what the law of a state may be, for the function of declaring and interpreting its own law is left to each state of the Union. But the effect of the state law in relation to a constitutional Act of Congress, in view of the constitutional provision that the latter shall be "the supreme law of the land," "laws of any state to the contrary notwithstanding," is for us to determine. Our first inquiry here, therefore, is whether the Interstate Commerce Act accords recognition to those state law rights, if any exist. To determine this federal question we assume, but do not decide, that Michigan law would consider this merger to be a liquidation, and would regard the recognition given to the common stock as entitling these dissenters to "full payment" in cash or its equivalent for both the par value of their preferred shares and accrued unpaid dividends thereon. Assuming such to be their rights under the law of the State, we must decide whether approval of a railroad merger under the Transportation Act of 1940 [5] is conditioned upon observance of

---

[5] Act of September 18, 1940, 54 Stat. 898.

such state law rights or can be made by the Commission contingently subject to them. A résumé of the history of that Act throws light on the problem dealt with by that legislation.

The basic railroad facilities of the United States were constructed under state authorization and restrictions by corporations whose powers and limitations were prescribed by state legislatures, or resulted from limitations on the states themselves. Construction in reference primarily to local or regional transportation needs created duplicating and competing facilities in some areas and provided inadequate ones in others. Expansion necessary to serve advancing national frontiers was stimulated by extensive subsidies from the Federal Government, largely in the form of land grants. But the stress and strain of World War I brought home to us that the railroads of the country did not function as a really national system of transportation. That crisis also made plain the confusions, inefficiencies, inadequacies and dangers to our national defense and economy flowing from the patchwork railroad pattern that local interests under local law had created.

The demand for an integrated, efficient and coordinated system of rail transport, equal to the needs of our national economy and defense, resulted in the Transportation Act of 1920.[6] In a series of decisions on particular problems, this Court defined the general purposes of that Act to be the establishment of a new federal railway policy [7] to insure adequate transportation service by means of securing a fair return on capital devoted to the service, restoration of impaired railroad credit, and regulation of rates, security issues, consolidations and mergers in the

[6] Act of February 28, 1920, 41 Stat. 456.

[7] "It is manifest . . . that the act made a new departure. . . ." Chief Justice Taft, in *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, 585.

interest of the public. The tenor of all of these was to confirm the power and duty of the Interstate Commerce Commission, regardless of state law, to control rate and capital structures, physical make-up and relations between carriers, in the light of the public interest in an efficient national transportation system. *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563; *New England Divisions Case,* 261 U. S. 184; *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456; *Railroad Commission of California* v. *Southern Pacific Co.,* 264 U. S. 331; *Texas & Pacific R. Co.* v. *Gulf, Colorado & Santa Fe R. Co.,* 270 U. S. 266.[8]

As a means to this end, the 1920 Act required[9] the Commission to prepare and adopt a plan for nation-wide consolidations of the railway properties of the country. It made this master plan the governing considera-tion in approving voluntary consolidations of railroads

---

[8] In *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456, 478, in referring to the *Wisconsin* case, 257 U. S. 563, and the *New England Divisions Case,* 261 U. S. 184, the late Chief Justice said: "In both cases it was pointed out that the Transportation Act adds a new and important object to previous interstate commerce legis-lation, which was designed primarily to prevent unreasonable or discriminatory rates against persons and localities. The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged."

[9] § 407 (4).

which were permitted only if in harmony with and in furtherance of the Commission's over-all plans.[10]  If they met that test, Congress provided that mergers could be consummated notwithstanding any restraint or prohibition by state authority.[11]

By 1940 it had become apparent that the ambitious nation-wide plan of consolidation was not bearing fruit. Various studies and investigations [12] led to the conclusion that it was a case where the best was an enemy of the good, and waiting for the perfect official plan was defeating or postponing less ambitious but more attainable voluntary improvements.  The Transportation Act of 1940 relieved the Commission of formulating a nation-wide plan of consolidations.  Instead, it authorized approval by the Commission of carrier-initiated, voluntary plans of merger or consolidation if, subject to such terms, conditions and modifications as the Commission might prescribe, the proposed transactions met with certain tests of public interest, justice and reasonableness, in which case they should become effective regardless of state authority.[13]  The Act does not specify every consideration to which the Commission must give weight in determining whether or not any plan meets the tests.  Section 5 (2) provides only that, "among others," the Commission shall consider the effect upon adequate transportation service, the effect of inclusion or failure to include other railroads, total fixed charges, and the interests of the carrier employees affected.  This Court has recently and unanimously said in reference to this Act, "Congress has

---

[10] § 407 (6) (a).

[11] § 407 (8).

[12] See, for example, report and recommendations by the President's Committee of Six, appointed September 20, 1938, whose report dated December 23, 1938, is considered part of the legislative history of the Transportation Act of 1940.

[13] See note 1, *supra.*

long made the maintenance and development of an economical and efficient railroad system a matter of primary national concern. Its legislation must be read with this purpose in mind." *Seaboard Air Line R. Co.* v. *Daniel,* 333 U. S. 118.[14]

So reading the legislation relevant to this merger, we find that approval of a voluntary railroad merger which is within the scope of the Act is dependent upon three, and upon only three, considerations: First, a finding that it "will be consistent with the public interest." (§ 5 (2) (b).) Second, a finding that, subject to any modification made by the Commission, it is "just and reasonable." (§ 5 (2) (b).) Third, assent of a "majority, unless a different vote is required under applicable State law, in which case the number so required shall assent, of the votes of the holders of the shares entitled to vote." (§ 5 (11).) When these conditions have been complied with, the Commission-approved transaction goes into effect without need for invoking any approval under state authority, and

---

[14] The Act itself included a statement of the "National Transportation Policy" in these terms: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

the parties are relieved of "restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction." (§ 5 (11).)

The Commission, under this Act as well as the Act of 1920, was also given complete control of the capital structure to result from a merger.[15] The carrier, even if per-

---

[15] Repeated recommendations of the Commission that the federal government occupy the field of regulation of railroad security issues and assumption of obligations were followed in 1920 by addition of § 20a to the Interstate Commerce Act (§ 439 of the Transportation Act of 1920, 41 Stat. 494).

As early as 1907 the Commission had stated that "the time has come when some reasonable regulation should be imposed upon the issuance of securities by railways engaged in interstate commerce." 12 I. C. C. 277, 306. This recommendation was renewed in the Commission's annual report for 1907, p. 24, and in every succeeding annual report up to and including 1919. The Commission incorporated in the 1919 report the statement concerning recommended legislation it had submitted to the Senate Interstate Commerce Committee, which included a recommendation for regulation of security issues.

House Report No. 456, 66th Cong., 1st Sess. (November 10, 1919), said with respect to the section which later became § 20a: ". . . The enactment of the pending bill will put the control over stock and bond issues exclusively in the hands of the Federal Government and will result in uniformity and greater promptness of action."

Section 20a as enacted in 1920 remained unchanged by the Transportation Act of 1940 and provides in part as follows:

"(2) . . . it shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier . . . or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier cor-

mitted by state law which created it, may issue no stock,. bond or evidence of indebtedness without approval. It may assume no obligation in respect of the securities of another person or corporation except with approval. And the approval is to be given only on a finding that it "(a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably neces-

poration, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the Commission by order authorizes such issue or assumption. The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose. . . .

"(6) Upon receipt of any such application for authority the Commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which the applicant carrier operates. The railroad commissions, public service or utilities commissions, or other appropriate State authorities of the State shall have the right to make before the Commission such representations as they may deem just and proper for preserving and conserving the rights and interests of their people and the States, respectively, involved in such proceedings. The Commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority.

"(7) The jurisdiction conferred upon the Commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein. . . ."

sary and appropriate for such purpose." 49 U. S. C. § 20a (2).

The jurisdiction of the Commission under both § 5 and § 20a is made plenary and exclusive and independent of all other state or federal authority. § 5 (11); [16] § 20a (7).[17]

The Commission, as we have seen, has found that the liabilities asserted by appellants, if settled by litigation or negotiation, will not impair the carrier's ability to perform its service, but it has not found the assumption of such liabilities to be compatible with the public interest under § 5 and § 20a. Indeed, since these claims exceed what the Commission has found to be just and reasonable, it could hardly find that assumption of such claims would be compatible with the public interest.

It appears to us inconsistent with the Interstate Commerce Act[18] for the Commission to leave claims growing out of the capital structure of one of the constituent companies to be added to the obligations of the surviving carrier, contingent upon the decision of some other tribunal or agreement of the parties themselves. We think

---

[16] For text of § 5 (11) see note 1.

[17] For text of § 20a (7) see note 15.

[18] In an early case (*Pittsburgh & W. Va. R. Co.* v. *Interstate Commerce Commission*, 54 App. D. C. 34, 293 F. 1001, appeal dismissed 266 U. S. 640) in which the constitutionality of § 20a had been upheld, the Court said: "If 'a fair return on capital devoted to the transportation service' [*New England Divisions Case*, 261 U. S. 184, 189] was to be insured the railway companies, and at the same time proper service and equitable rates accorded the public, the supervision of the issuance of stock, the incurring of bonded indebtedness, the extension and consolidation of railway lines, becomes of the utmost importance. Without this power to supervise the issue of stock and bonds, and thus limit the dividend and interest obligations of the carriers, as well as the expenditures in extensions and improvements, the fixing of adequate rates to insure a just return to the carrier, and at the same time equitable protection to the public, would be impossible. . . ."

198

that the Commission must pass upon and approve all capital liabilities which the merged company will assume or discharge as a result of merger. If some greater amount than that specified in the agreement is to be allowed to any class of stockholders, it must either deplete the cash or inflate the liabilities or capital issues of the new company. It may be that in this case the merged company will be strong enough to carry this burden and still perform its public service. But that is not the sole purpose of the supervision provided by statute. It is also in the public interest that no capitalization or indebtedness be carried over except that which meets the test of the Act in all other respects. We think the Commission was in error in assuming that it did not have, or was at liberty to renounce or delegate, power finally to settle the amount of capital liabilities of the new company and the proportion or amount thereof which each class of stockholders should receive on account of its contributions to the new entity.

We think it is equally clear that the Commission must look for standards in passing on a voluntary merger only to the Interstate Commerce Act. In matters within its scope it is the supreme law of the land. Its purpose to bring within its scope everything pertaining to the capital structures of such mergers could hardly be made more plain. Indeed, the very fact on which appellants rely heavily, that the Commission's jurisdiction is "plenary" and "exclusive," argues with equal force that federal law is also plenary and exclusive. The Commission likely would not and probably could not be given plenary and exclusive jurisdiction to interpret and apply any state's law. Whatever rights the appellants ask the Commission to assure must be founded on federal, not on state, law.

Apart from meeting the test of the public interest, the merger terms, as to stockholders, must be found to be just

and reasonable. These terms would be largely meaningless to the stockholders if their interests were ultimately to be settled by reference to provisions of corporate charters and of state laws. Such charters and laws usually have been drawn on assumptions that time and experience have unsettled. Public regulation is not obliged and we cannot lightly assume it is intended to restore values, even if promised by charter terms, if they have already been lost through the operation of economic forces. *Cf. Market Street R. Co.* v. *Commission,* 324 U. S. 548. In appraising a stockholder's position in a merger as to justice and reasonableness, it is not the promise that a charter made to him but the current worth of that promise that governs, it is not what he once put into a constituent company but what value he is contributing to the merger that is to be made good.

In construing the words "fair and equitable" in a federal statute of very similar purposes, we have held that although the full priority rule applies in liquidation of a solvent holding company pursuant to a federal statute, the priority is satisfied by giving each class the full economic equivalent of what they presently hold, and that, as a matter of federal law, liquidation preferences provided by the charter do not apply. We said that, although the company was in fact being liquidated in compliance with an administrative order, the rights of the stockholders could be valued "on the basis of a going business and not as though a liquidation were taking place." Consequently the liquidation preferences were only one factor in valuation rather than determinative of amounts payable. *Otis & Co.* v. *Securities & Exchange Commission,* 323 U. S. 624.

The appellants here, although the enterprise is to continue, insist on a valuation according to the letter of the charter. By this method the longer their stock is in default of dividends or earnings, the greater interest it

would have in the merged properties if the common stock was to be recognized at all. The Commission, however, did not consider that a long-continued default and the prospect of further default added greatly to the present intrinsic or market value of the stock in exchange. Its measuring rod was an economic rather than a legalistic one. The Commission considered the stock's past yield, present market value, and future prospects. It found that, all things considered, the merger terms gave to these appellants in new stock the fair economic equivalent of what they already held. It considered the deal just and reasonable on an exchange basis for a continuing enterprise. But it did not undertake to say whether, under the letter of their charter as construed under the law of Michigan, the preferred stockholders may not have a contract that would exact more than an economic equivalent.

Since the federal law clearly contemplates merger as a step in continuing the enterprise, it follows that what Michigan law might give these dissenters on a winding-up or liquidation is irrelevant, except insofar as it may be reflected in current values for which they are entitled to an equivalent. It would be inconsistent to allow state law to apply a liquidation basis to what federal law designates as a basis for continued public service. Federal law requires that merger terms be just and reasonable to all groups of stockholders, in contemplation of the continued use of their capital in the public calling to which it has been dedicated. Congress has made no provision by which minority stockholders, dissatisfied with a proposed railroad merger, may block it or compel retirement of their capital, as statutes often permit to be done in the case of private corporations where the public interest is not much concerned with its effect on the enterprise. And since Congress dealt with the subject of stockholders' consent, its failure to provide for withdrawal of non-

consenting capital cannot be considered an oversight to be supplied by us. A part of the capital dedicated to a railroad enterprise cannot withdraw itself without authorization any more than all of the capital can withdraw itself and abandon the railroad without approval. It must submit to regulations and to readjustments in the public interest on just and reasonable terms.

In determining whether each class of stockholder receives an equivalent of what it turns in, the Commission, of course, is under a duty to see that minority interests are protected, especially when there is an absence of arm's length bargaining or the terms of the merger have been imposed by management interests adverse to any class of stockholders. The Commission indicates both awareness and discharge of this duty in this case. Its finding that this plan is just and reasonable is not challenged here except on the basis of Michigan law. When stockholders are given what it is just and reasonable they should have, the Interstate Commerce Act does not permit state law to impose greater obligations on the financial structure of the merging railroads with consequent increased calls upon their assets or earning capacity.

We therefore hold that no rights alleged to have been granted to dissenting stockholders by state law provision concerning liquidation survive the merger agreement approved by the requisite number of stockholders and approved by the Commission as just and reasonable. Any such rights are, as a matter of federal law, accorded recognition in the obligation of the Commission not to approve any plan which is not just and reasonable. In making that determination, those rights are to be considered to the extent that they may affect intrinsic or market values. While the Commission has found that what the appellants are given in this plan is just and reasonable, the record indicates that it may have declined to consider these claims, even if they are found to have

some effect on the intrinsic value of the stock, because it thought it lacked jurisdiction.   Under these circumstances, we cannot be sure that in arriving at its conclusion that the plan was just and reasonable it did not exclude some factors that it should consider under the views set out in this opinion.   We therefore reverse the judgment below and remand the case to the Commission for reconsideration under the principles herein expressed.

*Reversed and remanded.*

MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

The railroads of this country are operated by not less than 693 corporations.   These exist by virtue of charters granted by the several States,[1] the laws of which govern their internal affairs, and, more particularly, the rights and liabilities of their stockholders.   The Chesapeake & Ohio is chartered by Virginia, the Pere Marquette by Michigan.   The laws of Virginia and Michigan respectively determine the conditions under which each may combine with other corporations.   The votes of sufficient stockholders of these two corporations to satisfy the laws of their respective States were in favor of a voluntary agreement for the absorption of the Pere Marquette by the Chesapeake & Ohio.   To consummate this agreement, however, required the authorization of the Interstate Commerce Commission under the terms of § 5 (2) of the Interstate Commerce Act, as amended by the

---

[1] According to the annual reports of Class I and Class II carriers on file with the Interstate Commerce Commission there is at present only one operating carrier chartered by Congress: the Texas and Pacific Railway.  See the Act of March 3, 1871, 16 Stat. 573, as amended by the Act of February 9, 1923, 42 Stat. 1223.

Transportation Act of 1940. The agreement provided, in short, that the total outstanding securities of the Pere Marquette, amounting to 450,460 shares of common, 124,290 of cumulative preferred, and 112,000 of prior preference, were to be exchanged for 211,429.4 shares of Chesapeake & Ohio common and 312,272.2 preferred. All but 9% of the security holders of the Pere Marquette cumulative preferred assented to this arrangement. The appellants, holding less than 2% of that class of stock, stood on their rights under Michigan law, claiming that they were entitled to the dividends unpaid since 1931, amounting to $72.50 per share.

The Interstate Commerce Commission approved the proposed merger but refused to pass on the legal claims thus asserted under Michigan law by the appellants. The Commission ruled that it was not called upon to pass upon individual rights against a merged road when the potential recognition of such rights, under appropriate State law, could not affect the public interest which it is requisite for the Commission to safeguard before authorizing a merger. For the Commission held that, even if the appellants' claims were sustained by Michigan law, the amount involved would in nowise affect either the security structure or the cash position of the Chesapeake & Ohio.

The Chesapeake & Ohio is capitalized at $191,433,919. An additional $28,949,745 of stock is to be issued, under the merger plan, for Pere Marquette shareholders, making a total capitalization for the Chesapeake & Ohio, after merger, of $220,383,595. The appellants own 2,100 shares of Pere Marquette cumulative preferred. The merger agreement offered them securities found by the Commission to be worth $111.60 per share, or $234,360. If their claim for full book value of $172.50 per share were honored, it would amount to $362,250. This contingent liability of $127,890, the Commission concluded, did not

affect its finding as to the soundness, from the point of view of the "public interest," of the financial structure devised and approved for this merger. The Commission further pointed out that even if 2% of each class of Pere Marquette stock—the maximum number contemplated by the agreement—were to refuse to participate, the difference between the value of the Chesapeake & Ohio shares offered to them and the book value of their Pere Marquette shares could, if required, readily be absorbed by a soundly based quarter-billion-dollar carrier.

Both the Chesápeake & Ohio and the Interstate Commerce Commission here urge this view of the law. The Court, however, reads the Commission's duty under the Act quite differently, although in reaching its conclusion the Commission applied its settled administrative practice.

I think that the Commission was right in the view it took of its powers and duties. Even if the matter were doubtful, the Court does not seem to me to give to the Commission's construction of the Act the weight to be accorded its experienced judgment, which we held in *United States* v. *American Trucking Associations,* 310 U. S. 534, 549, to be required. Since the Commission disclaims rather than asserts a power, there is all the more reason to feel assured of its disinterestedness and to resolve ambiguity in favor of its choice of construction.

Until the Transportation Act of 1920, carriers, while subject to the Sherman law, could combine without leave of the Interstate Commerce Commission. See *Northern Securities Co.* v. *United States,* 193 U. S. 197. The Transportation Act of 1920 required the authorization of the Commission for acquisition by one carrier of the control over another, to the extent defined by § 5 of the Interstate Commerce Act, as amended. By the Transportation Act of 1940, the voluntary merger of the properties of two or more carriers into one corporation was

sanctioned, subject, however, to the scrutiny of the Interstate Commerce Commission for the due protection of the "public interest." Congress defined with particularity the factors that constituted the "public interest" put into the Commission's keeping.

The Court now holds that State law governing the relations between State-chartered carriers and their stockholders is impliedly supplanted as to those who have refused to assent to a merger, even when the Commission finds that to leave the adjudication of those rights to the law that created them in nowise touches the "public interest" that is the sole condition to carrying out a wholly voluntary arrangement, and even though such a voluntary arrangement by itself could not affect the rights of dissenters. I have no doubt that Congress could compel the unification of railroad properties theretofore in separate ownership and in so doing override State-created legal rights of stockholders of the constituent carriers. In the case of financially embarrassed carriers, Congress, in the exercise of its bankruptcy powers, has empowered the Interstate Commerce Commission to formulate plans of reorganization, the terms of which, if fair and equitable, may override State-created legal rights of stockholders who do not assent. In the interests of a more efficient national railroad system, Congress may accomplish like results under the Commerce Clause. But that is precisely what Congress has refused to do. It was besought to eliminate the waste and inefficiencies due to the congeries of corporate instrumentalities through which the railroads of the United States operate, by providing for compulsory consolidations. It was also besought to do away with the complexities and confusion resulting from State corporations conducting the country's interstate railroad business, by requiring federal incorporation. Congress rejected both demands. See H. R. Rep. No. 650, 66th Cong., 2d Sess., pp. 63–64. It

left mergers of separate railroad properties into larger units to the will of their private owners, merely lodging a veto power in the Commission if such voluntary mergers run counter to the defined public interest. And Congress explicitly negatived the possibility of construing such supervision by the Commission as the creation, "directly or indirectly, of a Federal corporation."

The Commission was charged with seeing to it that the very limited requirements of § 5 (2) were observed, and to that end was given "exclusive and plenary" authority. § 5 (11). The purpose was to authorize a voluntary arrangement, to sanction an agreement, not to formulate a plan and to coerce its adoption, as is true of § 77. The law specifically enumerates the requirements that constitute the "public interest" which the voluntary agreement must satisfy to secure the Commission's approval. These are: the effect of the proposal on the public transportation service; the effect of including or failing to include other railroads in the plan; the resulting fixed charges; and the interest of the carrier employees affected. These factors have no bearing on whether the appellants' claim should be allowed. The great difference between these requirements and the detailed and comprehensive provisions of § 77, 11 U. S. C. § 205, carries a sharp legal contrast between the authorization which Congress required for voluntary mergers and the coercion of an imposed plan of reorganization in the case of insolvent roads.

Appropriate accommodation between federal and State interests in the construction of the Interstate Commerce Act is needlessly sacrificed by adding, to the detailed provisions whereby the Commission is merely authorized to approve voluntary mergers, an implied abrogation of State law in no respect inconsistent with such limited power of authorization, since the Commission found that survival of a claim under State law would not impinge

upon "the public interest." It ignores the salutary principle of construction, so strikingly illustrated by the *Los Angeles Terminal Cases* from which it was drawn, "that the Congress may circumscribe its regulation and occupy a limited field, and that the intention to supersede the exercise by the State of its authority as to matters not covered by the federal legislation is not to be implied unless the Act of Congress fairly interpreted is in conflict with the law of the State." *Atchison, Topeka & Santa Fe R. Co.* v. *Railroad Commission,* 283 U. S. 380, 392–93. See also *Palmer* v. *Massachusetts,* 308 U. S. 79.

Since it is needless, it is undesirable to draw an implication so destructive of State law from the Congressional scheme for allowing voluntary mergers. In fact, Congress has manifested not an intention to abrogate State law where the Commission finds no collision with the public interest; it has manifested an intention not to abrogate State law unless it interferes with carrying out an approved merger. Thus, it made the necessary proportion of assenting stockholders dependent on State law. It hardly seems congruous to provide that State law should determine when the opposition of stockholders may prevent a voluntary merger, but should have no effect on the rights which such dissenters have under State law, even where the Interstate Commerce Commission finds no national interest involved in determining and enforcing such rights. Again, while § 5 (11) relieves parties to an approved merger from the restraints of other laws, "Federal, State, or municipal," it does so only "insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission . . . ." This paragraph further contains an expressed disclaimer of authorization of federal incorporation. The prohibition of federal incorporation surely implied a desire to retain to the fullest possible extent the

ties between the States and their chartered corporations. One of the vital consequences of incorporation in a given State is the subjection of the relationship between stockholders and their corporation to the law of that State except insofar as federal law unmistakably overrides it.

The considerations relevant to voluntary railroad mergers sharply differ from those that control liquidations and reorganizations under § 77 of the Bankruptcy Act. (See also Railroad Reorganization Act of 1948, 62 Stat. 162.) A railroad in reorganization is administered by a bankruptcy court which has control of all its assets. The power of dealing with all claims is inevitably concentrated in that court. In merger proceedings, however, there is no obstacle to the practice pursued by the Commission of deciding what is "just and reasonable" and in "the public interest" as to each class of securities, while at the same time permitting any dissenter to stand on the terms of the particular stock issue, leaving to State law to determine what those terms are, provided only that the function of the new corporation, as part of an economic and efficient national railroad system, would not be affected by allowance of such claims. The Commission has here ruled that the appellants assert an unliquidated claim against the Pere Marquette sufficiently negligible not to affect the financial position of its successor, even if it be ultimately allowed in full. I fail to see that the effect on the Chesapeake & Ohio will be any different than that of negligence claims for the same amount. Every operating railroad is likely to have such claims outstanding against it at all times. Their existence does not interfere with the consummation of a voluntary merger. A reasonable amount of contingent obligations may easily be allowed for. In any event, the determination whether or not eventual liability for contingent claims of dissenting stockholders are such as to affect "the public interest" required to be protected by author-

ization of a proposed merger is precisely the function of the Interstate Commerce Commission and should appropriately be left to the exercise of its informed discretion.

The Commission has control, under § 20a, over securities, which of course it does not have over a contingent demand for compensation for loss resulting from negligence. But differences in the foundation of contingent claims do not determine their relevance to the Commission's authority in approving a merger and in leaving the determination of such claims to State law. While the rights asserted by the appellants arise out of their holding of securities, they may be paid off in cash, if their claims turn out to be well founded, and need not be satisfied out of the securities of the successor corporation.

Neither what Congress has written, nor what it has implied by the purpose underlying what it has written, persuades me that a power which the Commission itself has vigorously disclaimed it must now exercise. The Commission has consistently declined to adjudicate as a matter of State law—or what is now found to be federal law—contested claims not deemed relevant to its determination of "the public interest." *E. g., Sullivan-Purchase-Service Freight Line, Inc.,* 38 M. C. C. 621; *Jessup-Control-Safeway Trails, Inc.,* 39 M. C. C. 233, 241; *Lee-Control; Carolina M. Exp. Lines, Inc.—Lease and Purchase— Reed,* 40 M. C. C. 405, 407. See also *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 26–27; *Cleveland, Cincinnati, Chicago & St. Louis R. Co.* v. *United States,* 275 U. S. 404, 414.

The Court is holding, in essence, that while State law governs the rights of railroad stockholders before and after voluntary merger proceedings it is supplanted during such proceedings. In thus thrusting upon the Commission a jurisdiction which it itself has rejected, the Court is depriving the States of a measure of control over their own corporations when this is not required by a fair reading of

the Transportation Act, and although the survival of such State law does not interfere with the national interest as found by the agency selected by Congress for determining that interest.

I would affirm the judgment.

THE CHIEF JUSTICE and MR. JUSTICE BURTON join in this dissent.