In re PENNSYLVANIA EDISON CO. et al.

No. 9859.

United States Court of Appeals
Third Circuit.

Argued May 19, 1949.

Decided Aug. 31, 1949.

As Amended Sept. 1, 1949.

Allen E. Throop, New York City, (Shearman & Sterling & Wright, William W. Golub, Joseph A. Doyle, Jr., New York City, on the brief), for petitioner.

Roger S. Foster, Washington, D. C., (Harry G. Slater, Chief Counsel Division of Public Utilities, Ellwood L. Englander, Solomon Freedman, Attorneys, Securities and Exchange Commission, Washington D. C., on the brief), for S.E.C.

Morris Wolf, Philadelphia, Pa., (Wolf, Block, Schorr & Solis-Cohen, Mitchell E. Panzer, Morris L. Forer, Philadelphia, Pa., on the brief), for Pennsylvania Edison Co. Preferred Stockholders Protective Committee.

Before McLAUGHLIN, O'CONNELL and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

Pursuant to Section 24(a) of the Public Utility Holding Company Act of 1935, 49 Stat. 834, 15 U.S.C.A. § 79x (a), Associated Electric Company ("Aelec") here seeks review and reversal of an order of the Securities and Exchange Commission dated October 15, 1948. The ultimate issues for disposition are whether the Commission (1) properly determined that the preferred stockholders of Pennsylvania Edison Company ("Pened") were entitled to receive more than the contractual liquidation prices of their stock, and (2) properly allowed compensation to the preferred stockholders for the delay in payment of the difference between the liquidation prices and the values fixed by the Commission.

Aelec is a subholding company registered under the Public Utility Holding Company Act of 1935, having had as its operating subsidiary the Pennsylvania Electric Company ("Penelec"). From 1935, Pened was an operating subsidiary of NY PA NJ Utilities Company, a subholding company in the same system[1] as Aelec. Pened and Penelec, it may be noted, served electricity, chiefly, to contiguous areas in Pennsylvania. On December 28, 1945, the Commission granted applications and permitted declarations to become effective wherein the common stock of Pened, 166,600 shares of $1 par value, was transferred to Aelec. See Holding Company Act Release No. 6349. In proceedings commenced March 11, 1946, later converted at the request of Aelec to proceedings under Section 11(e) of the Act, 49 Stat. 820, 15 U.S.C.A. § 79k (e), a plan was proposed to "merge" Pened into Penelec whereby Penelec was to acquire all the assets of Pened, redeem all its obligations, and retire its preferred stock at liquidation prices plus accrued dividends.

Pened's preferreds, wholly owned by the public, were cumulative no par value stocks in two series of equal rank, but with different dividend rates, $5 and $2.80. The $5 series commanded a liquidation price of $75 and a redemption price of $80, while the corresponding prices for the $2.80 series were $50 and $52.50, both series carrying accrued dividends.[2] The sole voting power was vested in the common stock, except that on default of one year's dividends the pre-

---

1. General Public Utilities Corporation, the company surviving the consummated joint reorganization (under Section 11 (f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(f), and Chapter X of the Bankruptcy Act,

11 U.S.C.A. § 501 et seq.) of Associated Gas and Electric Company and its subsidiary, Associated Gas and Electric Corporation. See Holding Company Act Release No. 4985.

2. Additional characteristics were as follows:

| Dividend Rate | No. shares outstanding | Yield based on Liquidation Value | Yield based on Redemption Value |
|---|---|---|---|
| $5.00 | 123,466 | 6.67% | 6.25% |
| 2.80 | 84,029 | 5.60% | 5.33% |

ferred stockholders became entitled to vote, along with common stockholders, at all elections for directors until arrears were paid in full. However, since Pened consistently paid perferred dividends, the voting power remained with Aelec, owner of the common stock.

The perferred stockholders objected to their lot under the plan. To avoid the delays inevitably consequent, and thus to secure the advantage of favorable market conditions, a $1,000,000 escrow fund was created by Aelec to provide for the excess over liquidation prices of the preferred stock which the Commission should ultimately fix, together with such additional amount as the Commission would determine should be paid. Accordingly the controversy involving the values of the preferred stock was severed and postponed.

The Commission found that control of Pened by Aelec was exerted through a disproportionately small investment[3] and that the voting power was unfairly and inequitably distributed among the stockholders of Pened in contravention of Section 11(b)(2) of the Act, 15 U.S.C.A. § 79k(b)(2). Upon further appropriate findings, it approved the plan. Holding Company Act Release No. 6723. The plan has since been accomplished and the preferred stockholders have received the liquidation price of their stock subject, of course, to determination by the Commission of the actual price to be paid therefor.

Subsequently, hearings were held and a considerable amount of evidence received on the reserved issue. On the record, " * * * with particular reference to the earnings history and prospects of the company [Pened], capitalization ratios and earnings coverages, and yields on other securities, and after weighing the possibility that the preferred might have been

limited to liquidation price by voluntary action of the company apart from Section 11 * * * ", the Commission concluded that fairness required that, out of the escrow fund, there should be paid to the holders of the $5 series an additional sum of $5 per share, making a total of $80 per share under the plan, and to the holders of the $2.80 series, the sum of $2.50 per share, making a total of $52.50 under the plan,[4] plus compensation in each instance for the delay in payment of the additional amounts. Holding Company Act Release No. 8550. This, then, is the substance of the order of October 15, 1948, here in controversy. The order brought the total payment for the preferred stock up to the redemption price. The compensation for delay in payment of the additional amounts, from July 2, 1946, the retirement date, equalled the dividend yields on the stock at the values held to be their equitable equivalents at the time of the dissolution of Pened.

By way of orientation, it may be noted that Aelec does not, otherwise than as stated below, challenge the investment values attributed to the preferred stock by the Commission.[5] We are, therefore, spared the necessity of a comprehensive review of the factual bases upon which the Commission reached its result. Rather, Aelec takes the position that, apart from the necessity of complying with Section 11 of the Act, business judgment dictated the merger of Pened into Penelec, and such a merger would have been accomplished under Pennsylvania law, pursuant to which the preferred stockholders could have received only the liquidation price of their stock. Accordingly, it is urged that the order be reversed because, alternatively, (1) the standard of "fair and equitable" requires that claims of preferred stockholders who are to be paid in cash be measured by their liquid-

---

3. As of April 30, 1946, the long-term debt of Pened amounted to 64.1% of its capitalization and surplus adjusted to eliminate amounts subject to immediate write-off; the long-term debt and preferred stock (at liquidation prices) amounted to 95.1% thereof, and the common stock and surplus amounted to 4.9%. See Holding Company Act Release No. 6723. As of June 30, 1946, the corresponding figures were 63.7%, 94.5%, and 5.5%, respectively. See Holding Company Act Release No. 8550. Patently, the common stock equity, junior to both debt and preferred stock, was very thin.

4. One Commissioner dissented on the award to the holders of the $2.80 series.

5. Aelec's brief, pp. 10, 12.

ation preferences where those preferences would in all likelihood have come into play apart from Section 11, or (2) assuming the measure of the claims is their investment value, the Commission gave insufficient weight to the liquidation preferences in determining those values. Further, it is asserted that the Commission should not have based its estimate of values on market conditions prevailing at June 30, 1946, when utility preferreds were "selling at their all-time peak." Finally, Aelec contends that the award of compensation for delay in payment of the additional amounts is unfair to it and inconsistent with the rule governing interest awards, resulting in an unmerited windfall to the preferred stockholders.

Aelec and the preferred stockholders were, and are, at odds over the treatment Pennsylvania would have accorded to the preferreds had the merger been accomplished there. The Commission perceived the argument on both sides, but, holding that liquidation preferences under state law were not determinative, it did not attempt to resolve the disagreement. Instead, it approached the problem of evaluating the stock from the point of view that "fairness and equity require that the preferred stockholders be accorded the equitable equivalent of the rights surrendered." Therefore, it examined the rights of the preferred in the assets and earnings of Pened as a going concern.

In the course of its analysis, the Commission stated that Pened's corporate structure and financial position raised substantial problems for which merger into Penelec provided a satisfactory solution. It observed that there had been under consideration for many years, for operating and Section 11 reasons, the eventual joinder of the properties of Pened and Penelec, "* * * although it had never previously been decided how this would occur and it was considered possible for some time that the properties of Penelec would be merged into Pened, with Pened as the surviving company." On the record, there was, for the Commission, a question whether the merger would have occurred apart from Section 11, and the Commission doubted whether Pennslyvania would have restricted the pre-

ferred shareholders to the liquidation price. The Commission noted that the requirements of Section 11 handicapped the effectuation of a purely "business judgment" arrangement by methods other than the retirement of the preferred stock, and indeed, that was a primary factor moving the Commission to approve the plan in the first instance. And it emphasized that while the merger of Pened and Penelec was considered for several years, no action to promote that end was taken until Pened was transferred to Aelec and the present plan was proposed as a means of complying with the Act.

The Commission recognized that the major problem of Pened was to conform to the requirements of Section 11 by remedying the inequitable distribution of voting power; that in selecting from among the available devices of effectuating compliance, the company was moved to choose the plan most closely solving all its problems including those under Section 11, " * * * and it does not follow that the procedure selected would have been followed absent the necessity for resolving the Section 11 problems." The Commission was not persuaded that the merger was brought about solely by considerations unrelated to Section 11; on the contrary, it found that the primary motivation for the plan was the necessity for complying with Section 11. It did not "think it possible" to find on the evidence that the merger would inevitably have occurred absent the compulsion of Section 11; indeed, there was some question whether the merger would have taken place apart from the Act. It concluded, therefore, that only limited weight could be given to the possibility of the occurrence of such an event apart from the Act; and that the possibility of the termination of Pened's existence, Section 11 notwithstanding, and the effect of the Pennsylvania law, could not be regarded as having a substantial effect on the value of the rights of the preferred for which compensation must be accorded under the Act.

■ Recent decisions by the Supreme Court abundantly demonstrate the soundness of the Commission's thesis, that the constant in cases of this sort is purely fed-

eral in concept and application, and that the measure of what is fair and equitable—the dispositive standard—may be taken in terms of investment, or going-concern, values. Securities and Exchange Commission v. Central-Illinois Securities Corp.,[6] 1949, 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. ——; Otis & Co. v. Securities and Exchange Commission, 1945, 323 U.S. 624, 65 S.Ct. 483, 89 L. Ed. 511; cf. Schwabacher v. United States, 1948, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305. The exposition of the Central-Illinois controversy clearly establishes the legal validity of the Commission's method of evaluating in cash terms the equitable equivalents of the preferred stock. There, additional support for the proposition that investment values rather than charter provisions measure the preferred stockholders' right was gathered from the statement in the Schwabacher decision, supra, 334 U.S. at page 199, 68 S.Ct. at page 967, that "In appraising a stockholder's position in a merger as to justice and reasonableness, it is not the promise that a charter made to him but the current worth of that promise that governs, it is not what he once put into a constituent company but what value he is contributing to the merger that is to be made good." The effect of the Otis decision is that liquidation preferences are only one factor in valuation, and accordingly, what Pennsylvania might give to the preferred stockholders on a winding-up or liquidation "* * *, is irrelevant, except insofar as it may be reflected in current values for which they are entitled to an equivalent." Schwabacher v. United States, supra, 334 U.S. at pages 199, 200, 68 S.Ct. at page 968. Moreover, the Central-Illinois decision reiterated the rejection, by the Otis case, of distinctions based upon whether the dissolution is functional or merely technical, resulting not in termination but in continuation of the enterprise. The question, therefore, which the Commission had before it was whether and to what extent the corporate adjustments here involved were brought about by the impact of the Act.

We agree with the Commission that the record does not reveal substantial evidence of the inevitability of the merger or dissolution of Pened absent the compulsions of Section 11. We believe, also, that there is substantial evidence to support the Commission's findings of limited probability of the occurrence aside from the Act. There existed for years, in the holding company set-up under consideration, the non-Act or business reasons, on which Aelec relies, for accomplishing the joinder, in one way or another, of Pened's and Penelec's corporate or operational parts. But they were not compelling and the actuating force which brought about the particular plan to eliminate the preferred obligations of Pened was, significantly, the Act itself. Other plans were feasible to accrue business advantages to Pened, but there remained outstanding the necessity for complying with Section 11.

In assessing value of rights and judging the effect thereon of the likelihood of the dissolution of the particular investment receptacle without regard to the Act, we are forewarned that, "Administrative finality is not, of course, applicable only to agency findings of 'fact' in the narrow, literal sense. The Commission's findings as to valuation, which are based upon judgment and prediction, as well as upon 'facts,' like the valuation findings of the Interstate Commerce Commission in reorganizations under § 77 of the Bankruptcy Act [11 U.S. C.A. § 205] * * * are not subject to reexamination by the court unless they are not supported by substantial evidence or were not arrived at 'in accordance with legal standards.' " Securities and Exchange Commission v. Central-Illinois Securities Corp., supra, 338 U.S. 96, 69 S.Ct. 1377 at page 1393. Having found that the Commission exercised its jurisdiction in accordance with legal standards, and that its factual findings are supported by substantial evidence, we are constrained to hold that the probability of the termination of the corporate life of Pened, as indicated by the record, need not have been regarded by the Commission as substantially affecting the intrinsic, or market, value of the preferred stock. Certainly, Aelec has not shown facts, clearly disregarded by the Commis-

6. Reversing In re Engineers Public Service Co., 3 Cir., 1948, 168 F.2d 722 (same case).

sion, which would justify a decision on our part that the end of Pened, apart from the Act, was so apparent as to substantially affect investment values of its securities. That being so, it is not for us to say that the Commission might have given a little more weight to the probability than it did. There is no judicial yardstick marked off in precise and exact dimensions: we merely determine whether there is "substantial evidence", whether the Commission has reached an "allowable judgment", and whether its decision is "in accordance with legal standards". We are not equipped with delicate scales for the fine balancing of the numerous elements which enter into the Commission's "judgment and prediction". So long as the Commission's results are within the proper boundaries, we are estopped. The Commission, in this case, in our opinion, has remained within those boundaries.

We do not subscribe to the remaining contentions of Aelec.

 The Commission accepted June 30, 1946, as the time the transfer of Pened's assets to Penclec was consummated, and it was with reference to this date that it determined the value of the rights attaching to the preferred stock in the light of conditions then prevailing. Aelec not only agreed to this date before the Commission, along with all the other parties to the case, but insisted upon it. The specific language of Section 24(a),[7] therefore, forecloses Aelec from contesting its propriety in this Court for the first time. In any event, the Commission followed a rationale since approved in the Central-Illinois decision, that the fair equivalent between cash received and the security surrendered is that of reinvestment

in a security of comparable risk. It fully considered the prospects of Pened, the quality of its preferreds, the fact that yields on public utility preferred stock issues declined after 1942, and that the market for such issues was then very favorable. On the basis of these, and other, considerations, it exercised its informed and expert judgment, which is supported by the record. And, as stated in Central-Illinois, supra, 338 U.S. 96, 69 S.Ct. 1377, at page 1404, "Any changes which had occurred since the date of consummation would of course be irrelevant, for the preferred stockholders could not be required to surrender their investment and their advantageous dividend rate and yet remain subjected to the risk of fluctuation in the value of their erstwhile investment."

Finally, with respect to the escrow arrangement, it need only be pointed out that, by its virtue, Aelec was enabled to proceed with the plan taking advantage of favorable market conditions with substantial reward for its efforts. In addition to the difference between the amount then paid and the amount which would be payable under the approved plan, the Commission exercised a power it had reserved to award the preferred stockholders a sum sufficient to give them a return thereon measured by the return they would have received had the stock remained outstanding. This is fair and equitable. It put the preferred stockholders in a position substantially the same as if they had received the full value of their stock at the time of the consummation of the plan. Securities and Exchange Commission v. Central-Illinois Securities Corp., supra.

For the reasons stated, the order of the Commission will be affirmed.

---

7. 15 U.S.C.A. § 79x(a), which reads in pertinent part: " * * * No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do. * * * "

Aelec concedes that its expert testi-

mony related to the value of the Pened preferreds at June 30, 1946, and that it did not urge the Commission to make findings of long-term value. The reason advanced by Aelec for its failure to do so, that it believed evidence as to long-term value was inadmissible, is one we deem insufficient.