Gordon D. STOTT and Paul W. Zeck-hausen, a Protective Committee for Minority Stockholders of The Nashville, Chattanooga and St. Louis Railway, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Louisville and Nashville Railroad Company and The Nashville, Chattanooga and St. Louis Railway, Intervening Defendants.

United States District Court
S. D. New York.

Oct. 8, 1958.

Charles J. Nager, New York City, Charles E. Boles, Newell Blair, Washington, D. C., for plaintiffs. Fennelly, Eagan, Nager & Lage, New York City, J. W. McWilliams, Claude B. Wagoner, Philadelphia, Pa., of counsel.

Victor R. Hansen, Asst. Atty. Gen., Paul W. Williams, U. S. Atty., New York City, James E. Kilday, E. Riggs McConnell, Attys., Dept. of Justice, Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, I. C.C., Washington, D. C., for Interstate Commerce Commission.

Cravath, Swaine & Moore, New York City, W. L. Grubbs, Louisville, Ky., for intervening defendants. Bruce Bromley, New York City, R. W. Henriott, Louisville, Ky., John F. Hunt, Jr., New York City, J. L. Lenihan, Louisville, Ky., William H. Swiggart, Nashville, Tenn., of counsel.

Before MEDINA, Circuit Judge, and HERLANDS and BRYAN, District Judges.

FREDERICK van PELT BRYAN, District Judge.

This is an action pursuant to 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325, and under 5 U.S.C.A. § 1009, to annul and set aside, in part, an order of the Interstate Commerce Commission and for an injunction against its enforcement.

The order approved the merger of the Nashville, Chattanooga and St. Louis Railway, a Tennessee corporation, hereafter referred to as the Tennessee company, into the Louisville and Nashville Railroad Company, a Kentucky corporation, hereafter referred to as the Kentucky company. Plaintiffs are a committee for certain minority shareholders of the Tennessee company. They do not seek to set aside the merger, but attack only that portion of the Commission's order approving the proposed exchange ratio of one and one-half shares of new common stock of the Kentucky company for each share of common of the Tennessee company which the Commission found to be just and reasonable.

Plaintiffs contend that the order, in so far as it approved the proposed exchange ratio, should be set aside because of various errors of law and procedure claimed to have been committed by the Commission, and because its conclusion that the ratio was just and reasonable was not adequately supported "by subsidiary findings of fact supported in turn by substantial evidence on the record as a whole".

The merging railroads have intervened as parties defendant pursuant to leave granted by this court. The defendants United States and Interstate Commerce Commission and the intervening defendants have filed answers which in sub-

stance deny that plaintiffs have any ground for complaint concerning the findings, conclusions or order of the Commission.

After denial of an application by the plaintiffs for a temporary restraining order by the district judge who originally heard the application (154 F.Supp. 389) the case was heard before a three-judge district court designated pursuant to 28 U.S.C. §§ 2325 and 2284, and is now before that court for determination.

The Kentucky company, chartered as a railroad corporation in 1850, owns or leases and operates some 4,700 miles of railway in Alabama, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Ohio, South Carolina, Tennessee and Virginia. The Tennessee company, chartered as a railroad corporation in 1845, owns or leases and operates some 1,000 miles of railroad in Alabama, Georgia, Kentucky and Tennessee.

In 1880 the Kentucky company acquired control of the Tennessee company through stock ownership. At the time of the application before the Interstate Commerce Commission the Kentucky company, with 2,337,280 shares of common stock outstanding, owned 191,740 shares out of 255,983 shares of the Tennessee company common outstanding, or approximately 74.9%.

As of December 16, 1954, the two corporations entered into an agreement under which there was to be a complete merger of the two with the Kentucky company to be the surviving corporation. The liabilities of the Tennessee company were to be assumed by the Kentucky company and one and one-half new shares of common stock of the Kentucky company were to be issued to the shareholders of the Tennessee company for each share of Tennessee common stock held.

The merger agreement was approved at the annual meetings of the shareholders of each company held in April 1955. The vote of the shareholders of the Kentucky company was overwhelmingly in favor of the merger and its terms. At the meeting of the Tennessee company 211,000 out of a total of 238,628 votes cast were voted in favor of the merger and 18,641 shares were opposed. A separate ballot was taken on the proposed one and one-half to one exchange ratio. 208,559 out of 230,228 votes cast were in favor and 21,669 were opposed. Of the minority of the Tennessee shares which were not held by the controlling Kentucky company or its affiliates, 44% voted to accept the terms of the merger and 56% voted to reject them.

In January 1955 both companies jointly applied to the Interstate Commerce Commission under Section 5 of the Interstate Commerce Act (49 U.S.C.A. § 5) for approval of the merger agreement and authority to consummate the merger upon the terms proposed. At the same time the Kentucky company applied to the Commission under Section 20a of the Act, 49 U.S.C.A. § 20a for authority to issue additional shares of common stock necessary to carry out the merger agreement and to assume the obligations of the Tennessee company.

The present plaintiffs were permitted to intervene in the proceeding as a protective committee for minority stockholders of the Tennessee company in opposition to the proposed exchange ratio. The City of Nashville and other local interests also intervened in opposition to the merger itself, as did various organizations representing employees who claimed they would be adversely affected by the proposed merger.

Hearings on the application were conducted before an examiner in Washington and Nashville on eight separate days in August and September 1955. The record before the hearing examiner, totalling 1733 pages, includes the testimony of 65 witnesses and some 82 exhibits. In June 1956, after extensive briefs had been filed by the various parties, the hearing examiner reported to the Commission recommending the approval of the merger as consistent with the public interest and of the proposed one and one-half to one stock exchange ratio as just and reasonable.

A number of exceptions to the recommendations of the hearing examiner were filed with the Commission by the various intervenors, including the present plaintiffs. After the submission of briefs in support of and in opposition to these exceptions, the case was submitted to the entire Commission (except for one Commissioner who did not participate) and the Commission heard extensive oral argument. On March 1, 1957 the Commission filed its unanimous decision and issued the order here under attack.

In the main, the decision adopted the recommendations of the hearing examiner and authorized the consummation of the merger on the terms proposed, including the proposed stock exchange ratio of one and one-half to one, subject to certain conditions not pertinent here. 295 I.C.C. 457. Thereafter the present plaintiffs petitioned the Commission for reconsideration and modification of its decision and order, for reopening of the proceedings and for further hearing and argument. The Commission denied that petition on July 10, 1957.

In the meantime the City of Nashville, which had opposed the merger, commenced proceedings in the United States District Court for the Middle District of Tennessee, Nashville Division, seeking to set aside the Commission's order approving the merger. The State of Tennessee, the Tennessee Public Service Commission, a local county claiming to be affected, and representatives of employees of the merging railroads intervened as plaintiffs, and the merging railroads intervened as defendants. The matter was heard before a statutory court, which on May 27, 1957, unanimously affirmed the order of the Commission and dismissed the complaint. The court found that the findings of the Commission were full and complete and were supported by the evidence; that they formed sufficient basis for the order of merger and that no grounds had been shown which would justify setting the order aside. City of Nashville v. United States, D.C., 155 F.Supp. 98. The Supreme Court affirmed the judgment entered by the statutory court without opinion. 355 U.S. 63, 78 S.Ct. 139, 2 L.Ed. 2d 106.

■ It has been suggested by the defendants that the decision of the statutory court in Tennessee, affirmed by the Supreme Court, is, in effect, a prior determination of a number of the issues presented here. We do not accept that view. The issue there was whether the findings of the Commission that the merger was consistent with the public interest and its order, in so far as it approved the merger, should be sustained. Plaintiffs here were not parties to that action and the issues as to the fairness and reasonableness of the proposed stock exchange ratio were neither presented nor passed on.

While plaintiffs could have intervened in that litigation and raised there the issues which they now present, they did not do so and were under no compulsion so to do. Instead they chose to petition the Commission for reconsideration of its decision on the issues affecting them and then brought this action directed solely to such issues.

Thus, we do not regard the prior decision as controlling though its disposition of certain subsidiary questions common to both litigations is persuasive.

Section 5, Subdivision 2(a), of the Interstate Commerce Act (49 U.S.C.A. § 5) provides that it shall be lawful, with the approval of the Commission, for two carriers to merge into one corporation. After a public hearing on the application for merger,

"* * * If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) [of this paragraph] and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be

just and reasonable: * * *." 49 U.S.C.A. § 5(2) (b).

Upon the entry of such an order the participating carriers have full power to carry the approved transaction into effect.

Since the issues as to the approval of the merger itself were disposed of in City of Nashville v. United States, supra, the only question before us is whether the Commission's finding that the terms and conditions of the transaction as to the exchange ratio between the Kentucky and Tennessee stock were just and reasonable and its order approving such terms should be set aside.

■ The Interstate Commerce Commission is the tribunal appointed by law, informed by special knowledge and experience, and with the expert judgment required to make determinations under the Interstate Commerce Act. It has extensive facilities at its disposal and a wide knowledge of the transportation industry. Its decision and findings are to be given great weight by a reviewing court. If the Commission has acted within the scope of the power it can constitutionally exercise and which it was granted by statute, its decisions and findings cannot be set aside in the absence of a convincing showing that they are not adequately supported by substantial evidence or are unjust and unreasonable. Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 512–513, 64 S. Ct. 1129, 88 L.Ed. 1420; McLean Trucking Co. v. United States, 321 U.S. 67, 87–88, 64 S.Ct. 370, 88 L.Ed. 544; Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 317, 55 S.Ct. 713, 79 L.Ed. 1451; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260; Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U.S. 541, 547–548, 32 S.Ct. 108, 56 L.Ed. 308; Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

The present scope of permissible judicial review of an order of the Commission is that established by Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009. This section provides, in so far as pertinent here, that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (5) unsupported by substantial evidence in any case * * * reviewed on the record of an agency hearing provided by statute; * * *. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

Universal Camera Corp. v. National Labor Relations Board, supra, and O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483, while not altering the general rules as to the finality of administrative decisions, defined the enlarged responsibilities of a reviewing court under the Administrative Procedure Act.

Universal Camera holds that the reviewing court's determination as to whether there is substantial evidence to support the order of an administrative body must be made not merely on the basis of evidence which in and of itself justified the decision, but also by taking into account contradictory evidence or evidence from which conflicting inferences may be drawn. Substantiality of evidence "must take into account whatever in the record fairly detracts from its weight". 340 U.S. at page 488, 71 S.Ct. at page 464.

Under the Administrative Procedure Act the responsibility of the courts for the reasonableness and fairness of administrative decisions is greater than "some courts have shown in the past". "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function" and are responsible for assuring that the administrative body "keeps within reason-

able grounds". 340 U.S. at page 490, 71 S.Ct. at page 466.

As the Court of Appeals of this Circuit said in Gooding v. Willard, 2 Cir., 209 F.2d 913, 916:

"* * * 'substantial evidence' means more than evidence which, considered by itself alone, would be sufficiently persuasive to induce the trier of fact to give it the credence and weight essential to support findings. It must have those characteristics to such an extent that in the setting made by the entire record the trier may reasonably find in accordance with it after giving due consideration to whatever else is shown both in opposition or in accord. Judicial review has been extended by the Administrative Procedure Act to embrace adequate exploration of the record as a whole to enable the reviewing court to arrive at its own judgment in determining that."

Two recent cases, Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117, and Chicago, M., St. P. & P. R. Co. v. Illinois, 355 U.S. 300, 78 S.Ct. 304, 2 L.Ed.2d 292, also throw light on the scrutiny to be given by a reviewing court to decisions of the Interstate Commerce Commission. In essence, they lay down the rule that, in reaching a decision on a question committed to its judgment by statute, the Commission must give consideration to all of the criteria which Congress has required be taken into account in determining such question. In the absence of such a showing in the Commission's report or findings a reviewing court cannot determine whether the decision has been made in accordance with the mandate of Congress or not, and the decision must be set aside.

In the Schaffer case the Supreme Court set aside an order of the Commission denying an application by a motor carrier for authority under Section 207(a) of the Motor Carrier Act of 1935, as amended by the Transportation Act of 1940, 49 U.S.C.A. § 307(a), to transport granite between various points served exclusively by rail. The "inherent advantages" of the proposed motor service were a critical factor which the Commission was required by the statute to assess. The Commission failed to assess the "inherent advantages" of the proposed service but based its denial of the application on the ground that the existing rail service was "reasonably adequate". Moreover, it failed to evaluate the factors which it compared in concluding that the existing rail service was "reasonably adequate". The court therefore held that the decision did not comport with the national transportation policy declared by Congress in the Interstate Commerce Act (49 U.S.C.A. preceding § 1), and should not be permitted to stand.

The Chicago, M., St. P. & P. R. Co. case held that an order of the Commission authorizing an increase in intrastate passenger fares, which had previously been denied by the Illinois Commerce Commission, was not adequately supported by the Commission's findings. The order was made under 49 U.S.C.A. § 13(4) which authorized the Commission to prescribe intrastate fares if it found that "* * * any such * * * [existing intrastate] fare * * * causes * * * any undue, unreasonable or unjust discrimination against interstate * * * commerce". [355 U.S. 63, 78 S.Ct. 306.] Both the record before the Commission and the findings were entirely silent on the contribution to the railroad's out of pocket costs made by Illinois intrastate freight and passenger revenues other than the single segment of the carrier's intrastate operations represented by the suburban commuter traffic. The basic objective of Section 13(4) was to prevent discrimination against a carrier's interstate traffic which would result from saddling that traffic with an undue burden of providing intrastate services. The court found the Commission, by limiting its consideration to the revenues of the particular commuter service only, in disregard of the revenue contributed by other intrastate services,

did not give a fair picture of the intrastate operation or make the showing required under the statute that the carrier's interstate traffic was saddled with an undue burden of providing intrastate services.

■ These cases serve to emphasize that a reviewing court must scrutinize the record and the findings to determine whether the Commission has considered all the factors which the statute requires to be taken into account in making the decision under review. But they do not expand the scope of permissible review. They do not hold, by implication or otherwise, that the Commission must make detailed findings with respect to its rejection or acceptance of each item of conflicting evidence. Nor do they circumscribe the power of the Commission as a trier of the facts to make rulings within its reasonable discretion as to the admissibility or production of evidence. There is no requirement that the reviewing court comb through the record for insubstantial or non-prejudicial error, or substitute its own judgment for that of the agency, or consider the expediency or wisdom of the decision, or whether on like testimony it would have made a similar ruling. Nor is the reviewing court permitted to do so. Its sole function is to determine whether the Commission gave consideration to all of the factors which it was required to consider in making its decision, and whether on the record as a whole there was "substantial evidence" to support its findings and its order.

On the phase of the instant case now before us the sole question which the Commission was required by the statute to determine was whether the terms and conditions of the merger as to the proposed one and one-half to one ratio of exchange were "just and reasonable". 49 U.S.C.A. § 5(2) (b). The Commission was required to look only to the statute for the standards it was to apply. Schwabacher v. United States, 334 U.S. 182, 198, 68 S.Ct. 958, 92 L.Ed. 1305.

■ The report of the Commission stated (295 I.C.C. 497):

"Upon consideration of the record, we are convinced that, based on past and prospective earnings, and after consideration of the prospective savings, the proposed ratio is fair and reasonable to the stockholders of the Tennessee company. Consideration of other factors leads to the same conclusion."

This finding was an expression of the Commission's expert judgment on the sole question committed to it by the statute in an area in which it was particularly qualified to form such a judgment. Cf. Group of Institutional Investors v. Chicago, Milwaukee R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333; Securities & Exchange Comm. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. When viewed in the light of the record in its entirety, and after taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, and whatever in the record fairly detracts from the weight of the evidence, we conclude that this finding is amply supported by substantial evidence.

The report of the Commission, after discussing thoroughly and comprehensively the considerations affecting the merger and the factors to be taken into account in determining whether it was consistent with the public interest, went separately and at length into the reasonableness of the proposed stock exchange ratio. In so doing it applied the recognized and approved criteria for determining this question, and considered "what the stockholders of each of the railroads will contribute to the resulting enterprise". See Schwabacher v. United States, supra, 334 U.S. at pages 198–201, 68 S.Ct. at page 966.

The Commission considered the comparative earning power of the two companies in relation to the shares of their

stock outstanding. It analyzed the ratio of per share earnings for the five-year, ten-year, fifteen-year, twenty-year and twenty-five-year periods preceding the merger proposal, as well as those for the years 1955 and 1956 subsequent thereto. It went into the trend of traffic and earnings as affecting the exchange ratio for successive five-year periods ending on December 31st during the ten years from 1946 through 1956. It considered the relative passenger losses sustained by the two companies, what their respective traffics consisted of, their respective modernization programs and the effects of such programs on earnings. If went into the long-standing solicitation and routing agreement between them, and the effect of the 1951 amendment to this agreement. It considered prospective savings resulting from the merger divided equally between the two companies. In its discussion of all these factors it gave ample consideration to the arguments and the evidence submitted by the intervening minority in support of their position that a ratio more favorable to them should be allowed.

Consideration of all of these factors led the Commission to the conclusion that the proposed one and one-half to one ratio was fair and reasonable to the minority, and, indeed, analysis of the data which it considered indicates that this conclusion was soundly based.

The Commission, however, did not stop there. It went on to consider other factors which might bear on the question. These included the respective market prices of the stocks of the two companies both prior to the merger proposal and subsequent to the announcement of the proposed merger and the effect on such prices of the announcement; the respective dividends paid by the two companies over long periods of time and the percentage of earnings paid out in dividends by each; statistical comparisons directed to show the relative quality of the equities involved, including fixed charge coverage, margins of safety, gross profit margin, working capital and depreciation in relation to gross revenues and fixed charges, and expense ratio, the comparative book values of the two stocks, and the net investment of the companies per share of stock.

The Commission found that these factors supported the conclusion that the proposed ratio was fair and reasonable to the Tennessee minority and there is substantial evidence in the record as to each to support that finding.

Moreover, in the course of its consideration of the factors affecting the merger itself, the report of the Commission discussed fully such matters as the intercorporate relationships between the companies involved, their operations, mileages, traffic and revenues, equipment and shop facilities, respective credit strengths, consistency of traffic, territories served, balance sheet statements, valuation data for rate-making purposes, competition between them and with other railroads, possible loss and gain of traffic, anticipated savings from the merger, the effect of the long-standing solicitation agreement between the merging companies and of its modification in 1951, and other matters. Plainly, many of these also bore on the question of the fairness of the proposed exchange ratio, approval of which was being sought at the same time. Indeed, this discussion furnishes the setting and background for the Commission's discussion of the exchange ratio question.

■ There is no merit to the plaintiffs' contention that "the ultimate conclusion that the terms and conditions of the proposed merger are just and reasonable is not adequately supported by subsidiary findings of fact, supported in turn by substantial evidence on the record as a whole".

■ Plaintiffs complain that the Commission erred as a matter of law in failing in its duty "to see that minority interests are protected, especially when there is an absence of arm's length bargaining or the terms of the merger have been imposed by management interests adverse to any class of stockholders". Schwabacher v. United States, supra, 334 U.S. at page 201, 68 S.Ct. at page 968. There is no doubt that the Commission

has such a duty. But here, as in Schwabacher, the Commission indicated "both awareness and discharge of this duty * * *".

The Commission's report discusses fully the intercorporate relationships between the two companies, the history of their relationships, their capital stock, the control of the Tennessee company by the Kentucky company and the vote of the stockholders, both on the merger and on its terms. 295 I.C.C. 460, 461, 473.

It was plainly unnecessary for the Commission to make an express finding as to the obvious fiduciary obligations of the Kentucky company to the Tennessee minority, or to refer specifically to the precise number or percentage of minority shares which were voted against the merger, as the plaintiffs urge. It is apparent from the Commission's discussion of the arguments and evidence advanced by the minority on the question of the reasonableness of the exchange ratio, that it was fully aware of the minority's position and of its duty to protect it.

■ In carrying out this duty the Commission must look solely to the Interstate Commerce Act, the only requirement of which, as to minority or other stockholders, is that the merger terms must be just and reasonable to them. Dissenting stockholders are not entitled to any premium by reason of their dissent. Nor are they entitled to any special rights conferred on them as dissenters by the law of the state of incorporation. Even less are they entitled to any special treatment or advantages because of an attempt to "hold out" against the merger. Schwabacher v. United States, supra.

■ All that they are entitled to receive is what is "just and reasonable on an exchange basis for a continuing enterprise", or the "fair economic equivalent of what they already held". It is the "value [that they are] contributing to the merger that is to be made good" and nothing more. Schwabacher v. United States, supra, 334 U.S. at pages 199–200, 68 S.Ct. at page 967.

The Commission applied such standards here. In considering all of the factors determining "what the stockholders of each of the railroads will contribute to the resulting enterprise" it fully carried out its duty of protecting the interests of the minority.

Plaintiffs assert that the Commission erred as a matter of law in the treatment which it gave to the so-called solicitation and routing agreement between the merging companies, the 1951 amendment to that agreement, and the alleged effect of both upon the exchange ratio.

This agreement was entered into in 1872, some eight years prior to the time when the Kentucky company acquired control of the Tennessee company and was revised and reissued in 1906 and amended from time to time thereafter by memoranda and correspondence. Its terms are summarized in the Commission's report as follows (p. 483):

"Under the terms of the agreement, as modified, the southeastern section of the United States is divided into districts for the solicitation of traffic. Group A, called the Carolina territory, consisted primarily of all of South Carolina and the northern part of Georgia. As to traffic moving to and from this area via Evansville, Louisville, and Nashville, the Kentucky company agreed to solicit only on routes connecting with the Tennessee company at Nashville. Thus on traffic moving, for example, between Louisville and Atlanta, the Kentucky company would solicit only on the basis of a route restricting its haul between Louisville and Nashville, and would give the Tennessee company the remainder of the haul to and from Atlanta, even though the Kentucky company had its own single-line route between Louisville and Atlanta. Group B, referred to as the Birmingham territory, included virtually all of Alabama and the western portion of Florida. As to traffic between points in group B, on the one hand, and the gateways mentioned above,

on the other, the Tennessee company agreed to refrain from solicitation, although its line forms the major part of an alternative route between those points. Group C consisted of the portions of Georgia and Florida not included in groups A and B. On traffic moving to and from this territory, which was considered neutral, the Kentucky company and the Tennessee company had freedom of solicitation."

In 1951 the agreement was unilaterally modified by the Kentucky company which opened its route through Knoxville, Tennessee, to traffic moving between Louisville and Atlanta, and thereafter assumed the right to solicit traffic destined to Atlanta and other points in Georgia and South Carolina in Group A territory instead of leaving such solicitation exclusively to the Tennessee company for its own route from Nashville to the Atlanta territory.

The principal discussion of the solicitation agreement appears in the portions of the Commission's report which deal with the objections of the City of Nashville, and other local interests, to the merger itself. These interests contended that the agreement violated the Interstate Commerce Act and Section 1 of the Sherman Act, 15 U.S.C.A. § 1 and should be held invalid. In its report, however, the Commission concluded it could not properly determine in the proceeding before it whether or not the solicitation agreement "constitutes a lawful and binding contract between the two railroads involved". 295 I.C.C. p. 485.

The Tennessee minority stockholders, though failing to request the hearing examiner or the Commission to make a finding on the subject of the validity of the agreement until after the Commission's decision and order was published, argued in their petition for reconsideration that the Commission ought to have assumed that it was valid.

There is nothing to indicate that the Commission did not assume the agreement was valid. It certainly did not proceed on a contrary theory.

The City of Nashville continued to press its objection that the solicitation agreement was invalid before the statutory court in City of Nashville v. United States, supra. That court indicated that there was no merit to this contention for it found "no showing that there has been any violation of applicable antitrust laws of the United States". D.C., 155 F.Supp. at page 104.

We see no reason to disagree with this conclusion nor to assume that the solicitation agreement was not valid and binding on the railroads.

The Commission plainly gave thorough consideration to the agreement, the 1951 amendment, and the contentions made by the plaintiff with respect to its effect on the exchange ratio.

It stated (p. 485):

"The record shows that, despite the solicitation agreement, routes are open to and from B territory via the Tennessee company; that traffic moves over such routes, and that the Tennessee company maintains a traffic solicitor at Birmingham. There is no policing of the agreement, and solicitors of both companies have departed from it many times. During the month of October 1954, the Nashville, Chattanooga & St. Louis handled 182 carloads of freight to and from the B territory over routes which did not include the Louisville & Nashville south of Nashville. The president of the Louisville & Nashville expressed doubt that many of the present-day traffic solicitors ever saw the routing circular based upon the agreement between the two companies. The record indicates that the Tennessee company benefited from the agreement as much as the parent company, if not more."

There was evidence in the record that only 15% of the traffic over the routes covered by the solicitation agreement was

obtained by solicitation, that, despite the 1951 amendment, the bulk of the Kentucky company's Louisville to Atlanta area traffic continued to move via the Tennessee company's Nashville route, and that in any event the agreement had not been strictly observed by the parties.

With respect to the effect of the 1951 amendment the Commission said (p. 496):

"We are not impressed by the argument of the minority stockholders with respect to the 1951 amendment of the solicitation agreement. Even if it were conceded that the requested data would show that a diversion of traffic from the Nashville route to the Lebanon Junction route resulted from the 1951 amendment, such data could not affect materially our determination of the pending application. We cannot assume that the use by the Kentucky company of its own direct, single-line route was for the purpose of depressing the earnings of the Tennessee company, nor assume that any change would be brought about, with improvement in the latter's earnings, if the properties were operated separately in the future."

The results of the 1951 amendment of the solicitation agreement were but one of many factors which the Commission considered in reaching its conclusion that the proposed exchange ratio was just and reasonable. What effect, if any, the 1951 modification had on Tennessee earnings was a matter for the expert judgment of the Commission in the light of the record before it. It cannot be said that its conclusion that the amendment and its results could not have materially affected its determination of the exchange ratio issue was not supported by substantial evidence.

Moreover, it was for the Commission to determine what effect, if any, these matters might have on the justness and reasonableness of the proposed exchange ratio in the light of the many other factors bearing on that question. This

again was a matter for the Commission's expert judgment and there is ample basis in the record for the conclusion which it reached.

Plaintiffs, however, assert that the Commission was in no position to reach an informed conclusion on the effect of the 1951 amendment since the hearing examiner refused to require the submission of data showing the interchange of traffic between the Kentucky company and the Tennessee company at Nashville for the years 1951 and 1952, and his ruling was sustained by the Commission.

This data had been requested by the City of Nashville, which pressed its objection to the ruling against it on this question before the statutory court in City of Nashville v. United States, supra. The statutory court expressly found that the action of the Commission in failing to require the production of the 1951 and 1952 figures was not prejudicial error on the issues before it. 155 F.Supp. 104.

We reach the same conclusion here. Figures were made available to the intervenors as to traffic interchanged at Nashville in the years 1953 and 1954, as they requested. In view of the testimony to the effect that shippers rather than solicitors were responsible for routing 85% of all traffic, that any changes in routing by shippers as a result of solicitation or otherwise were slow to take effect, and that after the 1951 amendment the great bulk of Nashville-Atlanta area traffic still moved over the lines of the Tennessee company, it is difficult to see how the requested earlier figures for 1951 and 1952 could have significantly influenced the result.

Moreover, the requested figures could not have demonstrated even to an approximate extent what the alleged diversion was. They included a large volume of traffic interchanged at Nashville which was not covered by the solicitation agreement and was unaffected by it.

In any event, the data would have been cumulative at best. A hearing examiner, like any trier of the facts, is not

compelled to require the production of every scrap of evidence which a party desires or to extend the record inordinately. He has discretion to refuse to compel the production of evidence which is merely cumulative or which will not materially affect the issues presented.

Even assuming that the point was properly preserved by the plaintiffs in the course of the proceedings before the Commission, which is by no means clear, there was no prejudicial error in the refusal to require the production of the 1951 and 1952 interchange data.

The other contentions made by the plaintiffs merit little discussion.

Plaintiffs assert that the Commission committed numerous procedural errors. Some of these objections were considered by the statutory court in the City of Nashville v. United States, supra, and found to be without merit in so far as the issues in that proceeding were concerned. Others have already been discussed here.

We have considered all of these objections. We find that none of them are within the rule of prejudicial error which is the criterion established by Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009, and none constitute error which would require the setting aside of the Commission's order.

Nor is there any merit to the plaintiffs' somewhat obscure contention to the effect that the Commission should have stated its reasons for rejecting numerous specific items of evidence which the minority adduced instead of giving its conclusions as to the various factors which it considered in general terms.

There is no requirement in the Administrative Procedure Act, or otherwise, that the Commission discuss every piece of evidence in a record of over 1700 pages, or state reasons why it did not accept each item as establishing the fact which a party claims it to have proved, or as persuasive on an issue of fact. Such a requirement would only lead to decisions of inordinate length and complexity and would serve to confuse the issues rather than clarify them.

Indeed, the Commission is not required to make detailed findings of fact except in a case where damages are awarded. The statute requires only that it file a written report stating its conclusion with respect to the matter committed to it for decision, and indicating the factors which it took into account in reaching that decision. See Alabama Great Southern R. R. Co. v. United States, 340 U.S. 216, 227–228, 71 S.Ct. 264 95 L.Ed. 225.

The report of the Commission in this case is fully sufficient to enable us to ascertain that the Commission considered all relevant factors in reaching the conclusion which it did, and that its conclusion is adequately supported by "substantial evidence". It fully complies with the Administrative Procedure Act.

We thus conclude that no grounds have been shown for vacating and setting aside the findings and order of the Commission and its order is affirmed. Judgment will be entered accordingly.