880 F.2d 562
 131 L.R.R.M. (BNA) 3228, 279 U.S.App.D.C.
239, 58 USLW 2105,
112 Lab.Cas. P 11,425
 BROTHERHOOD OF RAILWAY CARMEN, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
CSX Transportation, Inc., Intervenor.
AMERICAN TRAIN DISPATCHERS' ASSOCIATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and the United States of
America, Respondents,
Norfolk & Western Railway Co. and Southern Railway Co., Intervenors.
 Nos. 88-1724, 88-1694.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 25, 1989.
Decided July 25, 1989.
As Amended Sept. 29, 1989.
 
 William G. Mahoney, with whom John O'B. Clarke, Jr., Washington, D.C., was on the brief, for petitioners.
 John J. McCarthy, Jr., General Counsel, I.C.C., with whom Robert S. Burk, Gen. Counsel, and Henri F. Rush, Deputy Gen. Counsel, I.C.C., Washington, D.C., were on the brief, for respondents. Robert J. Wiggers and John J. Powers, III, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 James S. Whitehead, Chicago, Ill., for intervenor in No. 88-1724.
 Jeffrey S. Berlin, with whom Mark E. Martin, Amy R. Doberman, Washington, D.C., and William P. Stallsmith, Jr., Atlanta, Ga., were on the brief, for intervenors in No. 88-1694.
 Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 The Brotherhood of Railway Carmen and the American Train Dispatchers' Association petition for review of orders of the Interstate Commerce Commission issued in separate proceedings before that agency. We dispose of the two cases together because they raise common issues with respect to the ICC's authority to exempt a party to a merger between railway carriers subject to approval under Sec. 11344 of the Interstate Commerce Act, 49 U.S.C. Sec. 10101, et seq. (the Act), from the provisions of (1) a Collective Bargaining Agreement (CBA); and (2) the Railway Labor Act, 45 U.S.C. Sec. 151, et seq.
 
 
 2
 Because we conclude that the ICC has misperceived, in one important respect, the scope of its exemptive power, we grant each petition for review in part, and remand the records to the ICC for further proceedings.
 
 I. FACTUAL BACKGROUND
 
 3
 The operative facts of the two transactions here at issue, and the background of the respective administrative proceedings, are as follows:
 
 A. The Carmen's Case
 
 4
 In 1980, the ICC approved a proposal under which CSX Corporation, a newly-formed holding company, would acquire control of two other holding companies: (1) the Chessie System, Inc., the principal railroad subsidiaries of which were the Chesapeake and Ohio Railway Company (C & O) and the Baltimore and Ohio Railroad Company; and (2) Seaboard Coast Line Industries, Inc., the parent of the Seaboard Coast Line Railroad (Seaboard) (later to become CSX Transportation, Inc., or CSX). CSX Corporation--Control--Chessie System, Inc., and Seaboard Coast Line Industries, Inc., 363 I.C.C. 521 (1980) (CSX Control ).
 
 
 5
 In its order approving the transaction, the ICC imposed upon the parties a standard set of labor-protective conditions, as required by Sec. 11347 of the Act, 49 U.S.C. Sec. 11347. CSX Control, 363 I.C.C. at 588-92, 604. As usual in merger cases, the applicable conditions were transplanted from the ICC's decision in New York Dock, 360 I.C.C. 60, 84-90 (1979), aff'd, New York Dock Ry. v. United States, 609 F.2d 83 (2d Cir.1979). Section 4 of the New York Dock conditions establishes procedures for the resolution--by means of negotiation and, failing that, binding arbitration--of any labor dispute arising from an ICC-approved railroad consolidation. Accordingly, Sec. 4 requires a "railroad contemplating a transaction which ... may cause the dismissal or displacement of any employees, or rearrangement of forces [to] give at least ninety ... days written notice...." Section 2 is a status quo provision:
 
 
 6
 The rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits ... under applicable laws and/or existing collective bargaining agreements or otherwise shall be preserved unless changed by future collective bargaining agreements.
 
 
 7
 In 1986, CSX, invoking Sec. 4 of the New York Dock conditions, notified the labor organizations representing its employees that it intended to close its freight car repair shop at Waycross, Georgia, and to transfer the work performed there to the C & O repair shop at Raceland, Kentucky, and that the transfer would result in a net decrease in available jobs at the two shops. The Brotherhood then attempted, on behalf of certain CSX employees who would be affected by the transfer, to negotiate an agreement governing the labor-related changes that the Waycross-Raceland consolidation would require.
 
 
 8
 Relations between the Brotherhood (and other unions) and CSX were governed by a CBA--known as the "Orange Book"--that they had negotiated in connection with the 1967 merger that created Seaboard; CSX and the Brotherhood continued to observe these terms after the 1980 CSX Control transaction. The Orange Book provides, with exceptions not here relevant, that the carrier will employ each covered employee for the remainder of his working life, and that no covered employee "shall be deprived of employment or placed in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment." In consideration for this job protection, the Orange Book gives the carrier the right "to transfer the work of the employees protected [t]hereunder throughout the merged or consolidated [i.e., Seaboard] system...."
 
 
 9
 The negotiations between CSX and the Brotherhood failed due to disagreements as to (1) whether displaced Waycross employees would retain their Orange Book right to lifetime income; and (2) whether (a) the Waycross-Raceland consolidation would result in a change in working conditions, and, if so, (b) CSX would be required to comply with the terms of Sec. 6 of the RLA, 45 U.S.C. Sec. 156, and thus to bargain before effecting the change. The Brotherhood then invoked the mandatory arbitration provision of the New York Dock conditions, but shortly thereafter, reversed its position and claimed that because the shop consolidation was not contemplated by the CSX Control transaction, the New York Dock conditions were not applicable at all. By then, however, CSX had invoked arbitration under the New York Dock conditions, and the matter came before a three-member arbitration panel (the Carmen Committee), with the Brotherhood participating under protest.
 
 
 10
 In the proceedings before the Committee, it became clear that CSX sought not only to transfer work from Waycross to Raceland and to reduce the total number of positions, but also (1) to transfer certain Waycross employees to employment by the C & O in Raceland and (2) to remove them from the protection of the Orange Book to coverage under the CBA between the C & O and the Union, which apparently does not contain a lifetime income clause. The Committee held that the Orange Book prohibited CSX from transferring either work or employees outside the Seaboard system created by the 1967 merger. The ICC did not pass upon that determination, but CSX, which has intervened in this appeal, does not dispute it.
 
 
 11
 The Committee then held, however, that (1) it had the power, "[a]s a quasi-judicial extension of the ICC" to abrogate provisions of a CBA, and to relieve CSX from any requirement of the RLA, that stood in the way of an operational change, such as the shop transfer, that was "authorized or required" by--though not specifically referenced in--the CSX Control decision approving the 1980 merger; and (2) it would (a) abrogate the Orange Book prohibition on the transfer of work, but not on the transfer of employees, outside the old Seaboard system, and (b) exempt CSX from the RLA insofar as it might require the carrier to bargain before unilaterally changing the Orange Book with respect to the work transfer.
 
 
 12
 The ICC upheld the Committee in other respects, but reversed the Committee's decision not to abrogate the Orange Book prohibition on the transfer of employees as well as work. The ICC further held that, to the extent that switching CSX employees from the Orange Book to the CBA at Raceland would deprive them of their right to income for life, that right would be abrogated. It did not pass upon the question whether the Orange Book did in fact prohibit the transfer of either work or employees but assumed as much.
 
 
 13
 In its petition for review, the Brotherhood challenges the ICC's authority under the Act to override provisions of the Orange Book and of the RLA. It also claims that the ICC's decision, insofar as it overrides the Orange Book, violates the Compensation Clause of the Fifth Amendment to the Constitution. Finally, it challenges the standard of review that the ICC applied in reversing the Committee's ruling against employee transfers.
 
 B. The Dispatchers' Case
 
 14
 In March 1982, the ICC approved the application of NWS Enterprises, Inc. (now Norfolk Southern, or NS), a holding company, to acquire control of two previously separate carriers--the Norfolk and Western Railway Company (N & W) and the Southern Railway Company (Southern). Norfolk Southern Corp.--Control--Norfolk & Western Ry. Co., 366 I.C.C. 173 (1982) (NS Control ). As in The Carmen's Case, the ICC imposed upon the parties to the transaction the standard New York Dock conditions. Id. at 231.
 
 
 15
 The American Train Dispatchers' Association was the bargaining representative of certain N & W employees responsible for power distribution. In September 1986, N & W and Southern informed the Association that they intended "to coordinate certain [N & W] work performed in the System Operations Center ... in Roanoke, Virginia into the [Southern] Control Center in Atlanta, Georgia," and in so doing, to abolish several supervisory positions at Roanoke. The carriers proposed an implementing agreement whereby the affected N & W supervisors would be "given consideration" for employment in new positions as Superintendents in Atlanta. Superintendents there were considered management employees, however, and were not covered by any CBA.
 
 
 16
 Attempts to negotiate an implementing agreement foundered over the Association's contentions that (1) the carriers' proposal was subject to mandatory bargaining under the RLA; (2) the carriers were required to preserve the right of the transferred employees to representation under RLA Sec. 2, Fourth, 45 U.S.C. Sec. 152, Fourth; and (3) the affected employees were entitled to retain their rights, including their seniority rights, under the CBA with N & W. The carriers then asked the National Mediation Board to appoint an arbitrator pursuant to the New York Dock conditions. As in The Carmen's Case, the dispute came before a three-member arbitration committee (the Dispatchers' Committee), which ruled in favor of the carriers on each of the disputed issues.
 
 
 17
 The rationale of the Dispatchers' Committee with respect to the CBA and the RLA was essentially the same as that of the Carmen Committee. It concluded that (1) it had the power to abrogate any CBA or RLA provision that impeded implementation of the ICC-approved merger of the N & W and the Southern; (2) the transfer of distribution functions, though not specifically considered in the NS Control case, was part of the control transaction; and (3) apparently because application of the N & W CBA to Superintendents at Southern would impede the transfer, transferred employees could not retain their rights under that CBA.
 
 
 18
 On June 6, 1987, after the ICC had denied the Association's application for a stay of the Committee's award, the carriers effected the work transfer authorized thereby. On June 10, 1988, the ICC affirmed the Committee in all respects, stating, in particular, that the Committee's third ruling was supported by the record insofar as "[i]mposition of the collective bargaining agreement would jeopardize the transaction because the work rules it mandates are inconsistent with the carriers' underlying purpose of integrating the power distribution function." The ICC also rejected the Association's claim that the transfer would deprive the employees of their right to representation under Section 2, Fourth of the RLA, reasoning that "[the Association's] rights as an incumbent bargaining representative are for determination by the National Mediation Board."
 
 
 19
 In its petition for review, the Association maintains that the ICC lacks authority under the Act to relieve the carrier of its obligation under the RLA and its CBA, and that its decision depriving the employees of their rights under the CBA violates the Compensation Clause of the Fifth Amendment.
 
 II. LEGAL BACKGROUND
 
 20
 Before taking up the merits of this dispute, we discuss briefly the relevant statutory framework, the agency's position below, and its claim to Chevron deference for that position in this court.
 
 A. Statutory Background
 
 21
 Sections 11341 and 11344 of the Act require that the parties to certain transactions listed in Sec. 11343, including carriers proposing to merge, first get ICC approval. 49 U.S.C. Secs. 11341, 11343, 11344(a), (c). Under Sec. 11344(c), the ICC must approve any such proposal "when it finds the transaction is consistent with the public interest." As noted earlier, Sec. 11347 requires that it also impose upon the merging carriers certain labor protective conditions; and it generally meets this requirement by imposing the New York Dock conditions described above.
 
 
 22
 Section 11341(a) provides that upon ICC approval of a Sec. 11343 transaction:
 
 
 23
 A carrier ... participating in that approved ... transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.
 
 
 24
 49 U.S.C. Sec. 11341(a). This is the so-called immunity provision at the center of this case.
 
 B. The Agency's Position
 
 25
 In its decisions in these cases, the ICC asserted that it has the power, which devolves upon an arbitration committee convened under Sec. 4 of the New York Dock conditions, to relieve a party to a Sec. 11343 transaction from any provision of a CBA or of the RLA that stands in the way of implementing that transaction. Its rationale for this assertion was less than clear, however, due largely to its failure to analyze separately the statutory provisions upon which it relied and their relation to the specific rights it purported to abrogate.
 
 1. Collective Bargaining Agreements
 
 26
 The ICC appears to have relied upon two bases for its claim that it may abrogate the provisions of a CBA. First, it cited the immunity provision, Sec. 11341(a), stating that it empowered an arbitrator appointed under the New York Dock conditions "to override existing agreements by requiring the work and employees to be moved...." Carmen, Joint Appendix (J.A.) 204; id. at 207 (Committee correctly understood ICC's view to be that Sec. 11341(a) overcomes "all legal obstacles preventing implementation" of an approved Sec. 11343 transaction); accord Dispatchers, J.A. 290-91. As both Committees noted, the ICC had come to this position only recently, in Denver and Rio Grande Western R.R. Co.--Trackage Rights--Missouri Pacific R.R. Co., Finance Docket 30,000, served Oct. 25, 1983 (DRGW ), rev'd sub nom. Brotherhood of Locomotive Engineers v. ICC, 761 F.2d 714 (D.C.Cir.1985), rev'd on other grounds, 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). Cf. Southern Ry. Co.--Control--Central of Georgia Ry. Co., 331 I.C.C. 151, 170 (1967) (immunity provision does not relieve carrier from CBA limitation on transfer of employees).
 
 
 27
 In The Carmen's Case, the ICC appeared also to rely upon Sec. 4 of the New York Dock conditions, which it read as supporting the Committee's ruling that it had "the absolute authority ... to effect changes in work and employee assignments," notwithstanding any CBA provision to the contrary. J.A. 207.
 
 
 28
 The ICC renews each of these theories on appeal.
 
 2. The Railway Labor Act
 
 29
 The ICC also appears to have advanced two sources for its power to override the RLA. First, it stated that the immunity provision exempts the parties to an approved Sec. 11343 transaction from any RLA procedure that might impede the effectuation of the transaction. Carmen, J.A. 204-05, 207 (recounting, and apparently approving, the Committee's conclusion "that, under the immunity provisions of [Sec.] 11341(a), implementation of transactions that we authorize under [Sec.] 11343, such as CSX Control, supersede employee protections under the RLA"); accord Dispatchers, J.A. 290. The ICC had reached similar conclusions in DRGW, supra, and in Union Pacific Corp., Union Pacific R.R. Co. and Missouri Pacific R.R. Co.--Control--Missouri-Kansas-Texas R.R. Co., et al., 4 I.C.C.2d 409, 514 (1988), a petition for review of which is currently pending before this court, see Railway Labor Executives Ass'n v. ICC, No. 88-1391 (argued April 28, 1989).
 
 
 30
 Second, the ICC stated that "[t]he mandatory arbitration provisions of New York Dock take precedence over the RLA dispute resolution procedures in transactions approved by this Commission...." Dispatchers J.A. 289; accord Carmen, J.A. 204. As we read it, the ICC's position was that when Congress enacted the current version of Sec. 11347, which incorporates by reference a set of dispute resolution procedures culminating in mandatory arbitration, it intended those procedures to be exclusive where they applied. Although it nowhere expressly abandons this theory, the ICC does not argue it in this court; it relies solely upon its Sec. 11341(a) theory.
 
 C. Chevron Deference
 
 31
 The ICC argues that its interpretation of the relevant provisions of the Act is entitled to deference under the principles set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-84, 81 L.Ed.2d 694 (1984), and that we should therefore uphold that interpretation as long as it is reasonable. We agree that Chevron applies to the ICC's reading of the statute that it is charged with implementing. Chevron establishes, however, two steps for judicial review of an agency's interpretation of law: we do not proceed to the question whether the agency's interpretation is permissible, and thus entitled to deference, unless we have first determined, based upon the language of the statute and the "traditional tools of statutory construction," id. at 843 n. 9, 104 S.Ct. at 2781-82 n. 9, that Congress has not "directly spoken to the precise question at issue ...; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781. We strike out first in search of Congress's intent in enacting the immunity provision of the Act.
 
 III. ANALYSIS
 
 32
 "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). We begin, as always, with the relevant portion of the statute (Sec. 11341(a)):
 
 
 33
 ... A carrier or corporation participating in or resulting from a transaction approval by or exempted by the Commission under this subchapter may carry out the transaction, own and operate property, and exercise control of franchises acquired through the transaction without the approval of a State authority. A carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.
 
 A. Collective Bargaining Agreements
 
 34
 We cannot sustain the ICC's position that this provision empowers it to override a CBA. First, and most important, the ICC's position finds no support in the language of the statute. By its terms, Sec. 11341(a) contemplates exemption only from "the antitrust laws and from all other law" to the extent necessary to carry out the transaction. Nowhere does it say that the ICC may also override contracts, nor has it ever, in any of the various iterations since its initial enactment in 1920, included even a general reference to "contracts," much less any specific reference to CBAs. Nor has the ICC explained how we can read the term "other law," as it has done, to mean "all legal obstacles." Dispatchers, J.A. 207. None of the Supreme Court decisions, discussed below, authorizing the ICC to abrogate an "other law" even suggests that the term means "all legal obstacles." The ICC itself, prior to its 1983 decision in DRGW, recognized as much. See Gulf, Mobile & Ohio R.R. Co.--Abandonment, 282 I.C.C. 311, 335 (1952) ("None of the decisions in the [Supreme Court] cases ... relates to private contractual rights, but refers [sic] to State laws which prohibit in some way the carrying out of the transaction authorized.").
 
 
 35
 Moreover, the ICC's proposed insertion of "all legal obstacles" into the statutory language would lead to most bizarre results. Under the ICC's reading, it could set to naught, in order to facilitate a merger, a carrier's solemn undertaking, in a bond indenture or a bank loan, to refrain from entering into any such transaction without the consent of its creditors. Cf. Gulf, Mobile & Ohio, 282 I.C.C. at 331-35 (declaring itself without power, in an abandonment context, to relieve a carrier from its "contractual obligations for the payment of rent"). We do not think it likely that Congress would grant the ICC a power with so much potential to destabilize the railroad industry; we are confident, however, that it would not do so without so much as a word to that effect in the statute itself. Never, either in its decisions here under review or in prior cases, has the ICC offered any justification for this most unlikely reading of the Act.
 
 
 36
 Perhaps we could tolerate the ICC's reading if it found strong support in either the "design of the statute as a whole," K Mart, 108 S.Ct. at 1817, or in its legislative history. We find nothing there upon which to sustain it, however; if anything, both tend to support the meaning conveyed by the words of the statute itself.
 
 
 37
 Congress first introduced the immunity provision, in a somewhat different form, in 1920. Transportation Act, 1920, 66th Cong., 41 Stat. 456, 482 (1920) (amending Sec. 5 of the Act) (1920 Act) Sec. 407. In the 1920 Act, Congress deputized the ICC to design a master plan to consolidate the nation's railroads into a limited number of strong systems; the plan was to be implemented by voluntary action on the part of the carriers. 41 Stat. 481 (Secs. 5(4), 5(6)), See generally Schwabacher v. United States, 334 U.S. 182, 191-93, 68 S.Ct. 958, 963-64, 92 L.Ed. 1305 (1948). It also, for the first time, gave the ICC exclusive jurisdiction to approve railroad consolidations; the agency was directed to approve any proposed consolidation that it found to be consistent with (1) its master plan; and (2) the public interest. (Congress removed the first criterion when, in 1940, it discarded the idea of a master plan. See id. at 193, 68 S.Ct. at 964.)
 
 
 38
 The immunity provision of the 1920 Act provided that:
 
 
 39
 The carriers affected by any order made under the foregoing provisions of this section and any corporation organized to effect a consolidation approved and authorized in such order shall be, and they are hereby, relieved from the operation of the "antitrust laws," ... and of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section.
 
 
 40
 41 Stat. 482 (Sec. 5(8) (emphasis added)).
 
 
 41
 It is reasonably clear from the history of the 1920 Act what Congress intended the immunity provision to accomplish. In 1917, President Wilson, in the exercise of his wartime powers, had taken possession of the railroads, in part to consolidate them into a unified transportation system in aid of the national defense. See Priorities Act, 65th Cong., 40 Stat. 272 (1917); Federal Control Act, 65th Cong., 40 Stat. 451 (1918). See generally 32d Annual Report of the Interstate Commerce Commission (1918) (1918 Annual Report ) at 1-2. Prior to that time, the ICC's authority over the railroads was relatively limited; the States, on the other hand--through their ratemaking commissions, their corporation laws, and their police powers--intensively regulated the carriers' rates, finances, and operations. Whereas state regulation had at first severely hampered efforts to enlist the railroads in the war efforts, Schwabacher, 334 U.S. at 191, 68 S.Ct. at 963, during the period of nationalization, neither state nor federal law stood in the way of the Government's purpose to further the war effort.
 
 
 42
 In 1920, when the period of federal control was about to end, Congress thought it imperative to the transportation needs of the nation that a program of coordination and consolidation be continued; this it chose to pursue, in part, by facilitating voluntary consolidations in accordance with the master plan the ICC was to develop. Id. at 191-94. See H.Rep. No. 456, 66th Cong. at 6-7, 18-19 (1919); H.Rep. No. 650, 66th Cong. at 643-64 (1920). See generally I.L. Sharfman, The Interstate Commerce Commission 153-70, 183 (1931). The carriers' return to private ownership, however, would bring with it two complications.
 
 
 43
 First, they would be again subject to regulation by the uncoordinated and often unfriendly state commissions and legislatures. As the Supreme Court stated in Transit Commission v. United States, 289 U.S. 121, 127, 53 S.Ct. 536, 538, 77 L.Ed. 1075 (1933):
 
 
 44
 ... Prior to the Transportation Act, 1920, regulations coincidentally made by federal and state authorities were frequently conflicting, and often the enforcement of state measures interfered with, burdened and destroyed interstate commerce. Multiple control in respect of matters affecting such transportation has been found detrimental to the public interest as well as to the carriers. Dominant federal action was imperatively called for.
 
 
 45
 See also Texas v. United States, 292 U.S. 522, 530-31, 534-35, 54 S.Ct. 819, 824, 825-26, 78 L.Ed. 1402 (1933) (in order "to insure an adequate transportation system" Congress gave the ICC power "to authorize consolidations, purchases, leases, operating contracts, and acquisition of control," to the exclusion of state laws that would burden the ICC's master plan).
 
 
 46
 Second, they would be newly subject to regulation by the recently invigorated antitrust laws of the federal Government itself; the Supreme Court had recently held that Sec. 1 of the Sherman Act made unlawful any merger between carriers that eliminated competition to even a limited extent. See United States v. Union Pacific R.R. Co., 226 U.S. 61, 88-89, 33 S.Ct. 53, 58-59, 57 L.Ed. 124 (1912).
 
 
 47
 Congress addressed both of these problems with the immunity provision of the 1920 Act. First, Congress placed in the ICC, and removed from the antitrust courts, the duty of considering the anticompetitive effects of any merger proposed to it. 41 Stat. 481 (Sec. 5(4)) (ICC master plan to preserve competition "as fully as possible"); McLean Trucking Co. v. United States, 321 U.S. 67, 73-78, 64 S.Ct. 370, 373-76, 88 L.Ed. 544 (1944). Second, Congress continued its wartime policy to centralize supervision of the nation's railroads and to eliminate conflicting state authority; thus, for example, ICC-approved consolidations could go forward, aided by the immunity provision, free of interference by the States. This general, centralizing sentiment was echoed in other sections of the 1920 Act, which gave the ICC authority, notwithstanding contrary state law, to (1) approve any extension, construction, or abandonment of tracks, see 41 Stat. 477-78 (Secs. 1(18), 1(20)); Transit Commission, 289 U.S. at 126-28, 53 S.Ct. at 537-38; (2) reject or permit any proposed issuance of securities, 41 Stat. 494-95 (Secs. 20a(2), 20a(7)); and (3) adjust rates it deemed unduly preferential or discriminatory, id. at 484 (Sec. 13(4)).
 
 
 48
 The ICC applied the immunity provision of the 1920 Act to exempt merging carriers from a wide variety of state law impediments. See, e.g., Clinchfield Ry. Lease, 90 I.C.C. 113, 134 (1924) (constitutional bar to foreign corporation operating railroad in state); Control and Operation of Louisiana & Arkansas Ry. Co., 150 I.C.C. 477, 487 (1929) (law forbidding consolidation, stock ownership, or lease of parallel or competing lines); Control of San Antonio & Arkansas Pass Ry. by Southern Pacific Co., 94 I.C.C. 701, 704 (1925) (local corporate headquarters requirement); Lease of Louisville, Henderson & St. Louis Ry. by Louisville & Nashville R.R. Co., 150 I.C.C. 741, 743-44 (1929) (law giving minority stockholders appraisal rights prior to sale of corporate property). And the Supreme Court consistently upheld its application. See, e.g., Seaboard Air Line R.R. Co. v. Daniel, 333 U.S. 118, 124-27, 68 S.Ct. 426, 429-31, 92 L.Ed. 580 (1948) (local incorporation law); Texas v. United States, 292 U.S. at 531-35, 54 S.Ct. at 824-26 (local corporate headquarters).
 
 
 49
 Thus, in the 1920 Act, Congress "made a new departure," Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R.R. Co., 257 U.S. 563, 585, 42 S.Ct. 232, 236, 66 L.Ed. 371 (1922), pressing for consolidation of the nation's railroads in a legal environment that had long been hostile to such a notion. When, upon the recommendation of the ICC, see Extension of Tenure of Government Control of the Railroads: Hearings Before the Committee on Interstate Commerce, United States Senate on the Extension of Time for Relinquishment by the Government of Railroads to Corporate Ownership and Control, 65th Cong., Vol. 1 at 231-305, 339-377 (1919) (remarks of ICC Commissioner Edgar E. Clark); Return of the Railroads to Private Control: Hearings Before the Committee on Interstate and Foreign Commerce of the House of Representatives on H.R. 4378, 66th Cong. at 8-139, 2857-2966 (1919) (same), it enacted into law a voluntary consolidation/immunity program--which the ICC had originally advocated in 1917, see Report of the ICC to the Senate and House of Representatives, 56 Cong. Rec. 45, 65th Cong., H. Doc. 503 (Dec. 5, 1917) (reprinted in 1918 Annual Report at 5-7)--it clearly meant to change that legal environment.
 
 
 50
 From our review of this history, we are confident that Congress did not intend, when it enacted the immunity provision, to override contracts. First, Congress focused nearly exclusively, in the hearings and debates on the 1920 Act, on specific types of laws it intended to eliminate--all of which were positive enactments, not common law rules of liability, as on a contract. Cf. Association of Flight Attendants v. Delta Air Lines, Inc., 879 F.2d 906, 917 (D.C.Cir. 1989). Indeed, Commissioner Clark, who presented the immunity idea to the House and Senate Commerce Committees in the hearings cited above, did not once suggest, over the course of several days and several hundred pages, that the proposed immunity might relieve a carrier of its obligations under negotiated agreements with third parties.
 
 
 51
 Moreover, in the legislative debates both on the 1920 Act and in 1926, when in the RLA it provided a framework for the regulation and enforcement of CBAs in the railroad industry, Congress exhibited a healthy respect for privately negotiated contracts; it rejected, for example, an amendment to the RLA that would have granted the ICC the power to suspend excessively generous wage agreements between carriers and their employees, in part on the ground that legislation abrogating labor agreements would be unconstitutional, see 67 Cong. Rec. 8884-86, 8892-93, 8896-97, 9190-91, 9196-97 (1926), and in part on the grounds that "there was a fundamental objection to making changes of a substantive nature in the agreement which the parties had reached," and that "[i]f agreement is to be resorted to [as a means of resolving labor management disputes], ... the agreement should not be destroyed by placing in the act provisions which would have that effect." S.Rep. No. 606, 69th Cong. at 5-6 (1926). And never, on the several occasions when Congress has revisited the immunity provision, has it either broadened that provision so as to reach "all legal obstacles" to an ICC-approved transaction, or acted more specifically to bring "contracts" or "collective bargaining agreements" within the reach of the statute.
 
 
 52
 Against this history as background, we can not impute to Congress the intention to make the bargained-for provisions of a CBA contingent upon their not later becoming inconvenient to the full realization of operating economies that a merger might make possible. Cf. Association of Flight Attendants, supra, at 917. We recognize that other forces may operate to abrogate a CBA in the post-merger context, as, for example, when the NMB, pursuant to its power under Sec. 2, Ninth of the RLA, 45 U.S.C. Sec. 152, Ninth, decertifies a union following an operational merger. See, e.g., International Brotherhood of Teamsters v. Texas Int'l Airlines, Inc., 717 F.2d 157, 161 (5th Cir.1983). We simply do not think that Congress has lodged any such power in the ICC, particularly where, as in each of these cases, the CBAs at issue survived the ICC-approved merger and were not, apparently, questioned by the parties thereto until the present disputes arose--several years after the merger.
 
 
 53
 B. The Railway Labor Act.
 
 
 54
 At least one court of appeals has held that the immunity provision of the Act may operate to override provisions of the RLA. Brotherhood of Locomotive Engineers v. Chicago & Northwest Ry. Co., 314 F.2d 424, 431-32 (8th Cir.1963). We decline to address the question here, however, for two reasons.
 
 
 55
 First. The Unions question whether the ICC has the power to apply the immunity provision at all. They note that Sec. 11341(a) is in terms "self-executing," which we take to mean that its effect is not to be determined by the ICC when it passes upon a transaction, but rather by the appropriate tribunal for the resolution of a particular case in which it is invoked by a carrier as a defense to the application of some "other law." They draw support for this position from two footnotes in Justice Stevens's concurring opinion in ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 270, 300 nn. 13 & 14, 107 S.Ct. 2360, 2377 nn. 13 & 14, 96 L.Ed.2d 222 (1987), in which the four Justices to reach the merits so opined.
 
 
 56
 It is true that the ICC has in the past itself taken this position. See Chicago, St. Paul, Minneapolis & Omaha Ry. Co. Lease, 295 I.C.C. 696, 702 (1958) (nothing in the Act "authorizes us to determine and declare the particular laws within the scope of [the immunity provision] from which a carrier shall be relieved. The terms of [the provision] are self-executing, and there is no need for this Commission expressly to order or declare that a carrier be relieved from certain restraints. It is sufficient if we make clear what the carrier is authorized to do. Congress has not conferred upon us the power to determine the disputes which are subject to the Railway Labor Act....") (citation omitted).
 
 
 57
 The ICC's statement in Chicago, St. Paul is correct to the extent that it means that the Commission is not required to determine what the effect of the immunity provision will be; the Supreme Court has long so held. New York Central Securities Corp. v. United States, 287 U.S. 12, 26-27, 53 S.Ct. 45, 48-49, 77 L.Ed. 138 (1932); Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382, 391, 52 S.Ct. 440, 442-43, 76 L.Ed. 808 (1922). The Court has also held, however, contrary to the implication of the first-quoted sentence from Chicago, St. Paul, that the ICC is authorized to make a determination, in approving a transaction, that laws standing in the way of its implementation must give way. See Seaboard, 333 U.S. at 124-27, 68 S.Ct. at 429-31; Texas v. United States, 292 U.S. at 531-35, 54 S.Ct. at 824-26; Schwabacher, 334 U.S. 182, 68 S.Ct. 958. See also Gulf, Mobile & Ohio R.R. Co. Abandonment, 282 I.C.C. 311, 335 (1952) (reading above cases as giving it the authority to set aside "State laws which prohibit in some way the carrying out of the transaction authorized"). Thus, we must reject the Unions' argument that the ICC lacks any power to consider a question of exemption that is properly presented to it.
 
 
 58
 Although the ICC's disclaimer of power in Chicago, St. Paul is overbroad insofar as it suggests that the ICC never has the power to determine a particular question of exemption, the result there can be reconciled with the Supreme Court cases cited above. In each of those cases the question of exemption arose before the consummation of the approved transaction; the issue was whether the ICC could, in the course of its approval of the transaction, remove a state law barrier to its effectuation. See Schwabacher, 334 U.S. at 200-01, 68 S.Ct. at 967-68 (ICC may override state law granting dissenting stockholders right to block merger); Seaboard, 333 U.S. at 121, 68 S.Ct. at 428; Texas v. United States, 292 U.S. at 531-32, 54 S.Ct. at 824-25. As the Unions correctly note, Chicago, St. Paul--like the cases now before us--involved a carrier's request, submitted well after the consummation of the ICC-approved transaction, for exemption from the RLA. The ICC declined the carrier's request, saying:
 
 
 59
 It is apparent that the [RLA] has not prevented the North Western from effectuating the transaction authorized by the prior order. That order authorized the lease by North Western of the lines of railroad and other properties owned, used, or operated by the Omaha, and this has been accomplished. The order did not provide any particular method for integration of the physical operations involved, and, except for the imposition of ... conditions for the protection of employees,, did not deal with employer-employee relationships.
 
 
 60
 295 I.C.C. at 702.
 
 
 61
 The ICC's broader disclaimer of any power to declare a carrier exempt from a law can thus be understood in the context in which it was presented; as the ICC interpreted the Act in 1958, it was without power to revisit an approved and successfully consummated transaction merely in order to relieve the merged carrier, after the fact, from the burden of complying with the RLA.
 
 
 62
 Even so understood, however, the ICC's holding in Chicago, St. Paul is still inconsistent with its current position; the transactions here at issue had long since been consummated when the ICC undertook to confer upon the merged carriers immunity from the RLA because it affected the "particular method for integration of the physical operations involved...." 295 I.C.C. at 702.
 
 
 63
 An additional difficulty is presented by the ICC's ruling with respect to the RLA generally. The ICC's interpretation of the immunity provision, as of its 1958 decision in Chicago, St. Paul, was that Congress had not given it the power to override the RLA at all. It reaffirmed that view in 1967 in Southern Railway Co., supra, when it stated that, in the absence of a stand-by agreement among the affected carriers and unions that would displace their existing CBAs in the event of a rail merger, "section 6 of the [RLA] would seriously impede mergers," 331 I.C.C. at 170-71--a statement that would not make sense if the agency thought it had the power simply to override Sec. 6 "as necessary" to let an approved transaction go forward.
 
 
 64
 The ICC's current interpretation of the immunity provision departs from this view, but we have found no explanation for the departure, save a citation in DRGW--the 1983 case in which it adopted its current stance--and decisions following it, to the Eighth Circuit's 1963 decision in Chicago & North Western Ry., supra. Because that case arose out of a dispute between a carrier and the unions representing its employees, however--a dispute to which the ICC was not a party--the court did not have the benefit of the agency's (then presumably contrary) views on the matter, nor did it cite any ICC precedent in support of its conclusion (apparently because, as of that time, none existed). For the ICC now to reverse its position solely on the basis of the court's holding is somewhat troubling, for three reasons. First, in 1967, in Southern Railway Co., the ICC was still of the view, the Eighth Circuit's intervening decision notwithstanding, that it lacked the authority to override the RLA. Second, in light of the ICC's close involvement with the historical development of the Act, it is disturbing that it would switch its position in unelaborated reliance upon a court case, which raised the issue in a different context and to which it was not a party, without giving any independent consideration to the matter. Third, the ICC has never related its current position to the context of the 1920 Act in which the immunity provisions first appeared; it has not, for example, related the original immunity provision in the 1920 Act to the comprehensive provisions of the same legislation governing labor-management relations, see 1920 Act, 41 Stat. 469-74--provisions that were, as we understand the legislative sequence, the immediate precursor to the RLA.
 
 
 65
 It may be that the ICC has made a conscious decision simply to depart from its earlier precedent. The ICC has not, however, said that it is doing so, much less articulated its reasons. As we stated in Oil, Chemical and Atomic Workers Int'l Union v. NLRB, 806 F.2d 269, 273-74 (D.C.Cir.1986), "[w]e need hardly elaborate on the settled principle that an agency may not depart from its precedent without explaining and justifying its change in position."
 
 
 66
 Second. In light of our holding that Sec. 11341(a) does not empower the ICC to override a CBA, it is unclear what are the consequences, if any, of its rulings that the carriers need not comply with the RLA. In The Carmen's Case, the heart of the dispute before the ICC was whether either the Commission or, derivatively, the Committee, had the power to relieve CSX from the terms of Orange Book that, as the Committee had interpreted them, prohibited the proposed transfer of work and of employees. The RLA was implicated, as we understand the dispute, only insofar as the Brotherhood argued that CSX could not unilaterally depart from the Orange Book without first complying with the procedures of the RLA. Because the ICC, in response, started from a premise (that Sec. 11341(a) gave it the power to relieve CSX of its contractual responsibilities) and reached a conclusion (that the RLA could not stand in the way of that power) that we hold was in error, it appears that nothing turns any longer on its conclusion. We remand the record to the ICC for reconsideration, however, in order to enable it to assess the situation in the first instance.
 
 
 67
 As for The Dispatchers' Case, the ramifications of our CBA ruling are somewhat less clear. There the CBA issue was whether the ICC could, by means of the immunity provision, relieve the N & W of obligations under its existing CBA in connection with the transfer of supervisory positions from Roanoke to Atlanta; the ICC said that it could, and we have held that it erred on that point. The RLA issues, as we understand them, were (1) whether the carriers could effect the transfer without first complying with the procedures of the RLA; and (2) whether the transfer, insofar as it deprived employees of rights under their CBA, violated the RLA. The second issue seems to drop out of this case for the same reason as the RLA issue appears to have become irrelevant in The Carmen's Case: because we hold that the ICC may not relieve the carriers of obligations under the CBA, the question whether it would violate the RLA to do so is purely hypothetical.
 
 
 68
 The first issue, if we are correct in stating it--the record on this point is less than crystal clear--may yet be alive. The ICC's opinion, however, gives us pause; it states that the continuation of the old agreement will "jeopardize the transaction"--by which it means not the merger but the transfer to Atlanta--"because the work rules it mandates are inconsistent with the carriers' underlying purpose of integrating the power distribution function." J.A. 291. Similarly, the carriers, as intervenors here, note that had the ICC not set aside the Roanoke CBA, its continuation "would have prevented the consolidation from going forward...." Because we hold that the ICC was without authority to set aside that CBA, it is unclear how the carriers will proceed. They may find it both impractical to adhere to the Roanoke CBA in the Atlanta setting, because it would introduce non-uniform work rules, and uneconomical to renegotiate the Roanoke CBA in order to achieve such uniformity; if so, they may determine simply to transfer the employees back to Roanoke. There would then be no issue left, so far as we can tell, regarding their duty to comply with the procedures of the RLA.
 
 
 69
 In light of this uncertainty as to the effects of our ruling on the continued vitality of the disputes before us, we think it best to remand them for the ICC to determine whether there is any live RLA issue remaining. Should the ICC determine that further proceedings are necessary on the RLA issue, it should, on remand, either provide an explanation for its new position on that issue, or adhere to its prior position.
 
 C. Other Issues
 
 70
 We decline to address either the ICC's theory that the labor protective conditions required by Sec. 11347 of the Act are exclusive, or its related assertion, in The Dispatchers' Case, that Sec. 4 of the New York Dock conditions gives the arbitration committee the "absolute right" to effectuate the transfer of employees, and to override any contrary provisions of a CBA. As noted earlier, the ICC has not argued the first theory to us at all; indeed, in its brief it took the position that the proceedings in Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives Ass'n, --- U.S. ----, 109 S.Ct. 2584, 105, L.Ed.2d 415 (1989) (P & LE ), which was then pending before the Supreme Court, were not relevant here, even though its exclusivity argument before the Supreme Court would appear also to encompass both the Sec. 11347 theory and the Sec. 4 rationale advanced in the decisions here under review. We do not consider as a basis for affirming the decisions a ground upon which the agency places no reliance on appeal. Cf. SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). In any event, we think it best for the ICC, if it has not abandoned its Sec. 11347 and Sec. 4 rationales altogether, to reconsider them in the first instance in light of the Supreme Court's intervening decision in P & LE rejecting the ICC's related position.
 
 
 71
 Because we hold that Congress did not, in enacting Sec. 11341(a), give the ICC the power to override provisions of a CBA, we need not address either the Unions' arguments that to do so would be unconstitutional or their claim that, in amendments to the Act in 1976, Congress specifically preserved employees' contractual rights. Our decision also makes it unnecessary to reach either (1) the Brotherhood's argument in The Carmen's Case that the ICC applied an improper standard when it reversed the Committee's ruling in favor of the Union; or (2) the Association's argument that the ICC, in its decision in The Dispatchers' Case, deprived employees of their rights under Sec. 2, Fourth of the RLA.
 
 IV. CONCLUSION
 
 72
 Because Sec. 11341(a) of the Act does not grant the ICC its claimed power to override provisions of a CBA between a carrier and its employees, we grant the petitions for review in that respect and reverse the ICC's decision. We remand the records with respect to the ICC's RLA holdings in order that the agency may determine whether further proceedings are necessary. See General Rule 15(c).
 
 
 73
 It is so ordered.